J. NORWOOD ADAMS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent J. NORWOOD ADAMS and VALERIA ADAMS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Adams v. Comm'r
Docket Nos. 7034-72 and 7042-72.
United States Tax Court
T.C. Memo 1978-152; 1978 Tax Ct. Memo LEXIS 363; 37 T.C.M. (CCH) 654; T.C.M. (RIA) 780152; April 19, 1978, Filed *363 Petitioner grossly understated his income in the years 1963 through 1968. Records maintained by petitioner were inadequate and respondent was required to reconstruct his income. Petitioner also managed his business affairs in such a manner as to conceal his true income. He sold nine pieces of property during the years in issue which were held from between one and seven years. He did not have a real estate license, and earnings from real estate dealings were comparatively low to his gross income from other sources. Held, petitioner's returns for 1963 through 1968 were false and fraudulent with the intent to evade taxes, thereby lifting the bar on the assessment and collection of the deficiencies for those years. Held,further, the additions to tax under sec. 6653(b), I.R.C. 1954, are applicable. Held,further, amount of deficiencies determined. Held,further, petitioner was not in the trade or business of real estate dealer. J. Norwood Adams, pro se. Frank D. Armstrong, Jr., for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: The respondent determined deficiencies in income tax and additions to tax pursuant to section 6653(b)[1] *364 as follows: n2 Addition Docket
to No.
Year
Petitioner
Deficiency
Tax
7034-72
1963
J. Norwood Adams
$41,933.05
$20,966.52
7042-72
1964
J. Norwood and
Valeria Adams
19,561.59
9,780.80
7034-72
1965
J. Norwood Adams
28,826.36
14,413.18
7034-72
1966
J. Norwood Adams
1,810.34
905.17
7034-72
1967
J. Norwood Adams
35,845.82
17,922.91
7034-72
1968
J. Norwood Adams
6,966.08
3,483.04
After concessions of the parties, the issues remaining to be decided are as follows: (1) Whether assessment of deficiencies against both petitioners for the year 1964 and husband petitioner for the years 1963 and 1965 to 1968, inclusive, is barred by the statute of limitations. For the years 1963 to 1965, inclusive, this issue depends solely on whether the returns filed were false and fraudulent with intent to evade tax; for the years 1966 and 1967, the issue turns on whether the returns were either fraudulent or understated Adams' gross income by greater than 25 percent and the notice of deficiency was timely sent; for the year 1968, the issue depends on whether the returns were either fraudulent or the notice was timely sent. (2) Whether any part of the underpayment, if any, of tax by petitioners for each of the years 1963 to 1968, inclusive, is due to fraud on the part of the husband petitioner. [3] *365 (3) What the proper amount of petitioners' income is for each of the years in issue. (4) Whether the real estate sold by petitioner during the years 1963 to 1968, inclusive, was held primarily for sale to customers in the ordinary course of business. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts together with the exhibits attached thereto are incorporated herein by this reference. Petitioners J. Norwood Adams and Valeria Adams are husband and wife whose legal residence at the time of filing the petitions herein was Angier, N.C. A joint Federal income tax return for the taxable year 1964 was filed by petitioners who reported income on the cash basis. For the taxable years 1963, 1965, 1966, 1967, and 1968, J. Norwood Adams filed Federal income tax returns using the married, filing separate status, and reported his income on the cash basis.
Petitioner filed his return for the year 1966 on July 17, 1967, and for the *366 year 1968 on June 19, 1969. For the remaining years, the returns were filed timely or within extensions granted by the Commissioner which are not relevant here. The notice of deficiency was issued on June 7, 1972. Petitioner was charged with violation of the provisions of Title 26, U.S.C., section 7206(1), for the taxable years 1958, 1959, and 1960. On August 29, 1966, Adams was convicted after pleading nolo contendere to this violation. In December 1966, an Internal Revenue agent contacted Adams for the purpose of examining his 1963 and 1964 tax returns. During the examination, the agent discovered cash expenditures the source of which could not be ascertained. In January 1967, the case was referred to the intelligence division for criminal investigation and assigned to a special agent. The case was twice reassigned to different special agents and a new revenue agent was assigned to work with the special agents. It was the latter revenue agent's report which was the basis for the statutory notices. The intelligence division's examination commenced in February 1967 and ended in June 1970. Early in the examination, it was determined that the books and records made available *367 to the agents by petitioner were inadequate to explain the large volume of cash going through his bank accounts. Petitioner was asked by the agents to produce all his books and records relating to the preparation of his tax returns. Petitioner was generally uncooperative and evasive during the audit and because he produced only cancelled checks and bank statements, substantially all of the information used in determining petitioner's tax liability came from third party sources. Petitioner maintained both checking and savings accounts with the First Citizens Bank & Trust Co., Angier, N.C., at all times here relevant. Throughout the entire period Valeria Adams also maintained a savings account with the First Citizens Bank & Trust Co., Angier, N.C. During the taxable years 1965 to 1968, inclusive, Adams maintained a savings account in the name of James Adams with the First Citizens Bank & Trust Co., Angier, N.C. Interest earned on this account was reported only on petitioner's 1965 return. During the course of the investigation, one of the agents contacted the First Citizens Bank & Trust Co. and requested all the savings accounts of Adams and his family. The James Adams account *368 was not turned over to the agent who discovered it only because he was searching for the $24,114 proceeds from the sale of 1,579 acres of land in Bladen County, N.C. He finally located a debit slip to the savings account in the name of James Adams for this amount.After requesting the account, the agent discovered it belonged to Adams. During the taxable year 1963 two savings accounts were maintained in the name of petitioners' daughter, Sandy Adams, with the Home Savings & Loan Association, Dunn, N.C. Sandy was about 15 years of age in 1963. One deposit was made to each account; one for $2,400 and one for $800. During the taxable years 1963 to 1968, inclusive, an account was also maintained in Sandy Adams' name with the First Citizens Bank & Trust Co.
During the taxable year 1963, petitioner and Wayne C. Coats (hereafter Coats), Adams' brother-in-law and Sandy's uncle, maintained a savings account with the Home Savings & Loan Association, Dunn, N.C., and one deposit was made to this account in the amount of $500. During the taxable years 1963 to 1968, inclusive, Adams was a partner in the partnerships of Electric Sales & Service and Weeks, Adams & Coats. During those same years, *369 Adams owned stock in the following corporations: Angier Construction Co., Inc.; AKA, Inc.; and C&D Insurance, Inc., a subchapter S corporation. Adams was president and 50 percent shareholder of AKA, Inc., during all times here relevant. The remaining 50 percent was owned by Airheart Insurance Agency. J. Milton Airheart (hereafter Airheart) is the secretary and treasurer of AKA, Inc. During this period, but not necessarily during each year, petitioner owned stock in Camelot Development Co., Inc., Sterling Distributors, Inc., and Auto Parts Distributors, Inc. 1963 Taxable Year
Adams and Coats were equal partners in a residential building construction business. The partnership was liquidated and the assets, consisting solely of cash and accounts receivables, were distributed to both partners in proportion to their interests. Adams received $535 in accounts receivables and $184.93 cash. The date of distribution is in dispute and was either in 1962 or 1963. Partnership returns were filed for both years: on the 1963 return it is stated the partnership was dissolved January 1, 1963. On December 4, 1963, Sam Cummings (hereafter Cummings) and his wife, Vera, gave petitioner a note *370 drawn in the face amount of $3,845 providing for annual installments in the amount of $769 per year plus interest at six percent. Principal payments of $769 were made on the note during the years 1964, 1965, and 1966. Interest was also paid in the amounts of $229, $184, and $138, respectively. Petitioners did not report the interest on their joint income tax return for 1964, nor did Adams report the interest on his income tax returns for 1965 or 1966. Sometime prior to 1960, Adams and Nelson Currin (hereafter Currin), Adams' brother-in-law, purchased a farm as joint tenants for $7,500. In 1962, Currin bought Adams' interest in the farm for $8,700, and borrowed an additional $1,600 from Adams. Currin signed a non-interest bearing note on January 22, 1962, for the full amount of $10,300, payable $2,000 annually between 1963 and 1967 and $300 in 1968. Receipts of the payments were initialed on the back side of the note. The sale was not disclosed on petitioner's income tax return for any year. Adams also held a $10,000 non-interest-bearing note, dated January 5, 1961, representing a loan made by him to Carson R. Coats. Adams gave Carson R. Coats receipts for payment and retained *371 the note for his records. The back of the note evidenced payment in cash by Carson R. Coats of $5,000 on January 5, 1963, and $5,000 on January 7, 1964. 1964 Taxable Year
During the taxable years 1964 through 1966, Adams received checks from the Agricultural Stabilization and Conservation Service (hereafter ASCS); such amounts were reported on petitioners' returns in the following amounts: Amount
Amount Reported Year
Received
per Return
Understatement
1964
$3,414.01
$592.20
$2,821.81
1965
2,600.92
811.80
1,789.12
1966
4,475.03
921.75
3,553.28 During the taxable years 1964, 1965, and 1966, Chester Williams received ASCS payments of $126.52, $144.87, and $281.64, respectively, which he signed and gave Adams. 1965 Taxable Year
By deed dated December 19, 1963, H. W. Williams and his wife, Virginia, transferred 1,200 acres of land in Turkey Creek Township, Pender County, N.C., to Adams for $26,000. By deed dated March 11, 1965, Adams and his wife transferred the land to William and Nancy Price and Edwin and Venta Smith. William Price (hereafter Price) and Edwin Smith (hereafter Smith) paid $55,000 for the land which was paid for as follows: $5,000 by check dated February 24, 1965; $10,000 by check *372 dated March 23, 1965; and by issuance on March 11, 1965, of three notes by Smith and others to AKA, Inc., two in the face amount of $13,333 and one in the face amount of $13,334. In June 1965, Smith and Price sold the Pender County land to C. L. Mackie (hereafter Mackie).Smith issued a check to AKA, Inc., for $4,978.84 to apply on the foregoing notes. Mackie gave AKA, Inc., two new notes in the amounts of $13,333 and $21,999. On June 14, 1965, Adams deposited $4,000 of the $4,978.84 check issued by Smith to AKA, Inc., in his personal checking account with First Citizens Bank & Trust Co. The $13,333 note given by Mackie to AKA, Inc., was assigned to First Citizens Bank & Trust Co. When the note became due, it was satisfied on December 22, 1966, by a check issued by Southern Furniture Company of Conover, Inc., to AKA, Inc., in the amount of $14,355.18 ($1,022.18 representing interest). On the following day, Adams' liability ledger sheet at First Citizens Bank & Trust Co. was credited with a payment of $13,333 and there was a deposit in his personal checking account of $1,022.18; both of these transactions were funded from the proceeds of the check issued by Southern. The $21,999 *373 note given by Mackie to AKA, Inc., was also assigned to First Citizens Bank & Trust Co. When this note became due, it was paid by Mackie by his personal check dated December 12, 1967, in the amount of $24,748 ($2,749 representing interest on the note). On the same day, First Citizens Bank & Trust Co. issued a bank money order to itself for $24,748. On January 24, 1968, the bank money order was deposited in Adams' personal checking account except for $5,000 cash retained by Adams. None of the proceeds from the sale were ever deposited into the account of AKA. On his 1965 income tax return, petitioner reported gain of $6,682.75 ($27,500 sales price, representing one-half the gross sales price, less $20,817.25, the adjusted basis, including allowance for sales costs); AKA, Inc., also reported gain on the sale on its 1965 return. Adams did not report any of the $4,082.02 interest income received on the notes. ($310.84 in 1965 from Edwin Smith, $1,022.18 in 1966 from Southern Furniture Company, and $2,749 in 1967 from C. L. Mackie.) On February 15, 1965, Adams received a payment of $100 from French Creek Hunting Club for use of a parcel of his land for hunting purposes. This rental *374 income was not reported by petitioner on his 1965 tax return. On November 18, 1965, Adams sold 1,579 acres of land in Bladen County, N.C., to Marion J. Corbett (hereafter Corbett) for $79,500. On December 3, 1965, Corbett issued a check in the amount of $74,500 to Adams, and on December 7, 1965, it was placed in an escrow account in Adams' name with R. J. Hester, Jr., an attorney. Adams received the proceeds from the sale of the land, less costs of sale, in three separate checks: one for $30,000 dated December 7, 1965, one for $28,814.15 dated December 10, 1965, and one for $1,987.50 dated February 21, 1966. Adams reported $24,407.60 gain on the sale on his 1966 tax return, but not on his 1965 return. Respondent determined that Adams realized gain on the sale of $25,240.93 in 1965. On March 8, 1965, Bennie Daniel (hereafter Daniel), Graham Howard (hereafter Howard), and Adams entered into a written agreement whereby Daniel agreed to pay Howard and Adams $2,225 in consideration of their forebearance in submitting an upset bid at a foreclosure sale of property at which Daniel was the highest bidder. Payment was made by Daniel to petitioner and Howard by the issuance of two checks: *375 the first dated March 31, 1965, and payable to Adams, Howard, and Jerry S. Alvis from the trust fund of Ellis Nassif, attorney, in the amount of $1,114.65; the second dated April 2, 1965, and payable to Adams and Howard from Daniel in the amount of $1,110.35. Both checks bear petitioner's endorsement. No part of the proceeds received by Adams was reported by him on his 1965 income tax return although he should have reported 50 percent of the consideration received, or $1,112.50, as his share of the proceeds from the contract. On petitioners' 1964 income tax return, Adams deducted as a bad debt $1,010 owed him by Willie Sanders (hereafter Sanders). The obligation owed by Sanders was secured by a deed of trust against certain real property owned by Sanders; as such, it was not worthless and should not have been deducted. In May 1965 the property was sold by Sanders, and as a condition to Adams releasing his security interest, petitioner was issued a check in the amount of $1,145. Petitioner did not report the bad debt recovery on his 1965 return. On October 9, 1965, Adams wrote a check payable to Bill Bentley for $900. The expenditure was made for relocation of a house owned by *376 AKA, Inc., and was properly an expense of AKA, Inc. Adams deducted the payment on his 1965 income tax return as a farm expense. Daniel Matthews (hereafter Matthews), C.P.A., prepared petitioners' income tax returns for the years in question. In determining Adams' farm expenses, Matthews used petitioner's cancelled checks and classified them into various categories. In the normal course of Matthews' practice, he consulted petitioner whenever he could not determine how to categorize a check; there are no notations appearing on the check issued to Bill Bentley which indicate the purpose for which it was received. On December 24, 1965, Adams wrote a check for $1,150 payable to Baxter Lee (hereafter Lee). The expenditure was actually made for grading work done by Lee on the King property, which was owned by AKA, Inc. When the check was presented to the bank for payment, it contained the notation "Bulldozer Work Farm" on the bottom left corner of the check. When the check was found in petitioner's bank records during the agents' investigation, it was discovered the notation had been changed by the insertion of the word "King" before the word "farm." "King" had been inserted with *377 a pen and the "K" changed to an "R" in pencil to make it "Ring" farm. The payment to Lee was improperly deducted by petitioner as a farm conservation expense on his 1965 Federal income tax return. 1966 Taxable Year
On March 31, 1966, Adams and the Department of the Army entered into a lease for rental of a portion of Adams' land for military maneuvers. On July 13, 1966, the Treasurer of the United States sent Adams a check for $100 as payment for use of the land. Adams did not report this amount on his 1966 return. On January 20, 1966, B. B. Sapp paid Adams $1,000. The check contained the notation "comm on Bashford land." No part of the $1,000 was reported on petitioner's 1966 income tax return. Sapp is a real estate agent in Raleigh, N.C., and had a number of real estate transactions involving Adams. During the years 1966 to 1968, inclusive, Adams had a sharecropping arrangement with Jack Hall. In 1966, Hall received two ASCS checks, each in the amount of $91.77, which he signed and gave Adams. Adams did not report either check on his 1966 return. During the years 1966 to 1968, inclusive, Adams failed to report interest earned on the James Adams account. 1967 Taxable Year *378 In January 1965, Adams received a 9.75-acre parcel of land from John Bashford (hereafter Bashford) in return for his assistance in helping Bashford obtain tobacco allotments transferred between tracts of land owned by Bashford. At the time the 9.75 acres were given to Adams, title to the land was in the name of J. C. Ransdell (hereafter Ransdell). Bashford transferred the land to Ransdell in order to transfer the tobacco allotments from it. On February 20, 1967, the parcel was sold to J. H. Cochrane (hereafter Cochrane), representing the Overnite Trucking Co., as part of a 92-acre tract going from Ransdell to Cochrane. Cochrane issued a check for $9,750 which was deposited in the trust account of attorney Phillip C. Ransdell, who searched the title on the property and then disbursed the proceeds as follows: Revenue Stamps
$ 11.00
Phillip Ransdell
25.00
Preston Price
250.00
B. B. Sapp, Agent
7,965.65
J. C. Ransdell
1,498.35
Total
$9,750.00
Petitioner directed the net proceeds of $7,965.65 be paid by check to his agent, Sapp. Sapp deposited the check in his personal checking account. After deducting his commission, Sapp issued two checks, one in the amount of $222.25 to be applied towards *379 taxes owed by petitioner, and one in the amount of $7,493.40 to Paul Avert. The check made payable to Paul Avert was never delivered to him. Adams sent his son, Steve, to pick up the money; the check was cashed by Sapp and the proceeds turned over to Steve. No part of the $7,715.65 gain realized by Adams was reported on his 1967 tax return. Adams directed his C.P.A. to file an amended return for 1967 and include the gain on the sale, but this was never done. Moreover, the direction did not occur until after the investigation had begun. On March 27, 1965, Adams entered into a written contract with Lonless Fields (hereafter Fields). In consideration for $7,000 Fields agreed to sell a 30-acre tract of land which he (Fields) owned to a third party. To the extent the proceeds of the sale exceeded $12,000, Fields was to share the proceeds with Adams on an equal basis. As security for his interest, Adams obtained from Fields a deed of trust on the tract securing an indebtedness of $23,500. The tract was sold in 1967 and Adams received $22,863.09 as his share of the sale. Adams endorsed the check and deposited it in the account of AKA, Inc. On December 1, 1967, a check was issued *380 to Adams by AKA, Inc., for $11,777.56 and signed by Adams and Airheart. Petitioner reported $11,777.56 gain from this transaction on his 1967 income tax return ($18,777.56 gross sales price less $7,000 basis). On its income tax return for the taxable year ended July 31, 1968, AKA, Inc., reported gain in connection with the sale on the full sales price. Respondent treated the transaction as though it were entirely Adams' and, therefore, determined that Adams should have reported the entire gain from the sale. Additionally, respondent charged petitioner with having made a loan of the proceeds of the sale, $22,863.09, to AKA, Inc. On May 11, 1960, Daniel Fogleman (hereafter Fogleman) and Nannie Fogleman conveyed 22.12 acres of land located in Wake County (hereafter referred to as the Rands Mill Road property) to Adams and his wife. The deed was not recorded until August 31, 1967, after the investigation began. Petitioner paid Fogleman $3,500 by check and a disputed additional amount.On October 5, 1967, Adams sold the Rands Mill Road property to John Smith, who paid petitioner $11,500 for the property plus a fee of $66.50. Payment was made by issuing a check to James E. Trull (hereafter *381 Trull), real estate agent, for $5,066.50 and giving a note and deed of trust to Adams for $6,500. John Smith issued a check to Adams in 1968 for $1,390, reflecting $1,000 principal and $390 interest. After commissions and expenses of the sale were deducted from the $5,066.50 check, Trull issued a check to Adams for $4,407.94 and a check to Harland Adams for $250 as a commission on the sale. On his 1967 return, petitioner reported gain from the sale of the Rands Mill Road property in the amount of $2,938.60 (gross sales price of $7,666.67 minus $4,728.07 cost). Petitioner arrived at this amount by reporting two-thirds of the $11,500 sales price less two-thirds of $7,092.06 (cost of land) plus $592.06 (selling expenses). Respondent determined Adams' correct gain to be $7,407.94 ($11,500 gross sales price less $4,092.06--$3,500 cost of land, $342.06 selling expenses, and $250 commission to Harland Adams). In addition, Adams reported only $300 of the $390 in interest received on the John Smith note on his 1968 return. As part of the investigation an analysis of petitioner's bank deposits and cash expenditures was made to determine petitioner's income. A combined computation of *382 the bank deposits and cash expenditures analysis set forth in the statutory notices is as follows: 1963
1964
1965
Bank Deposits [1]
First Citizens Bank & Trust Co., Angier, N.C.
Checking Account - J. Norwood Adams
$ 86,705.46
$212,249.72
$ 77,298.81
Savings Account - J. Norwood Adams
1.07
1.12
1.19
Savings Account - Valeria Adams
1.13
Savings Account - James Adams
24,163.29
Savings Account - Sandy Adams
80.00
367.27
140.79
Home Savings & Loan Association, Dunn, N.C.
Sandy Adams
2,400.00
J. Norwood Adams and Wayne C. Coats
500.00
Sandy Adams
800.00
Total Bank Deposits
$90,486.53
$212,619.24
$101,604.08
Add: Cash on Hand at December 31
24,200.00
$125,804.08
Less: Loan Proceeds
$ 11,087.50
$163,030.00
$ 18,515.64
Electric Sales & Service - Partnership Drawing
11,080.57
9,467.29
8,740.05
C&D Insurance, Inc. - 1120S Distribution
1,000.00
500.00
1,033.87 n2
Real Estate Sales and Schedule D Receipts
27,950.00
12,068.50 n3
78,792.99
Loan Principal Payments Received
3,267.00
8,450.00
17,000.00
Note Payments Received
5,000.00
Withdrawals from Savings
2,000.00
948.47
Total
56,385.07
194,464.26
129,082.55
TOTAL
$34,101.46
$ 18,154.98
$ (3,278.47)
Total Outlays
Expense Outlays Per Return
$ 17,242.44
$ 18,333.06
$ 13,647.15
Personal Expenses
10,696.44
6,695.05
14,634.01
Investments and Loans
52,995.63
91,796.40
46,321.43
Real Estate
39,550.00
92,071.42 [4]
6,000.00
Loan Principal Payments
17,500.00
54,440.00
21,295.64
Other
2,692.06
9,675.52
Total Outlays
$140,676.57
$263,335.93
$111,573.75
Less: Total Checks Written
86,648.39
210,955.85
77,960.43
Cash Expenditures
54,028.18
52,380.08
33,612.32 [5]
Gross Receipts Corrected
$88,129.64
$ 70,535.06
$ 30,333.85
Gross Receipts Per Return
20,161.77
24,211.35
14,137.79
Understatement
$67,967.87
$ 46,323.71
$ 16,196.06
*383 1966
1967
1968
Bank Deposits [1]
First Citizens Bank & Trust Co., Angier, N.C.
Checking Account - J. Norwood Adams
$132,681.95
$ 62,623.74
$ 97,979.64
Savings Account - J. Norwood Adams
1.17
1.08
1.20
Savings Account - James Adams
30,280.34
24.45
10.46
Savings Account - Sandy Adams
445.89
878.65
736.83
Total Bank Deposits
$163,409.35
$63,527.92
$98,728.13
Add: Cash on Hand at December 31
24,748.00
$88,275.92
Less: Cash on Hand at January 1
$ 24,200.00
$ 24,748.00
Loan Proceeds
50,000.00
$ 18,585.00
50,880.00
Electric Sales & Service - Partnership Drawing
9,889.70
13,228.22
10,588.65
C&D Insurance, Inc. - 1120S Distribution
750.00
2,250.00
1,050.00
Real Estate Sales and Schedule D Receipts
8,987.50
5,175.44
6,300.00 n2
Loan Principal Payments Received
5,200.00
19,294.98
Note Payments Received
13,833.00
28,990.00
1,000.00
Withdrawals from Savings
53,847.31
1.20
937.10
Totals
$166,707.51
$87,524.84
$95,503.75
TOTALS
$ (3,298.16)
751.08
3,224.38
Total Outlays
Expense Outlays Per Return
$ 15,426.40
$ 15,321.48
$ 15,970.83
Personal Expenses
65,699.79
20,335.59
20,606.60
Investments and Loans
51,821.72
28,124.29
16,534.01
Real Estate
9,925.00
26,082.20
29,500.00
Loan Principal Payments
27,446.63
53,188.00
56,383.00
Other
4,424.26
496.00
Total Outlays
$174,743.80
$143,547.56
$138,994.44
Less: Total Checks Written
130,688.24
63,413.60
98,206.16
Cash Expenditures
44,055.56
80,133.96
40,788.28
Gross Receipts Corrected
$ 40,757.40
$80,885.04
$44,012.66
Gross Receipts Per Return
19,255.93
18,767.59
23,398.10
Understatement
$ 21,501.47
$62,117.45
$20,614.56
*384 In making the foregoing analysis, respondent's agents first totaled all deposits to Adams' checking and savings accounts (joint or otherwise) as well as deposits made to savings accounts of Adams' immediate family. Included in the statement of total deposits is any interest credited to these accounts except for any interest earned on Sandy Adams' accounts. To these totals any cash on hand at December 31 of each of the years was added. From these totals the following sources of nontaxable income were substracted: [4] cash on hand at January 1 of the current year, nontaxable cash receipts (loan principal payments received and note payments received), additional cash available to Adams (withdrawals from bank accounts, loan proceeds), and other cash received by Adams from certain businesses he owned (Electric Sales & Service, C&D *385 Insurance, Inc.) and funds generated from real estate sales and other sales of property as reported on petitioners' income tax return. To this amount was then added the year's total cash outlays (expense outlay reported on Adams' income tax returns, personal expenses, investments and loans made by Adams, real estate purchases and payments on land purchases, loan principal payments, and certain other miscellaneous items). From the total outlay was subtracted the total amount of checks written by Adams to determine the total cash expenditures during the year. The total cash expenditures were then added to the gross amount of taxable receipts to arrive at the gross receipts for the year. Finally, the gross receipts arrived at by this method were compared with the gross receipts mentioned *386 in Adams' return for each year. This figure provided the understatement of income. Respondent conceded he failed to properly give credit to Adams for the following amounts: $400 received from Jimmy Partin in 1963 as a loan principal payment received, repayments of notes for $2,200 and $5,000 in 1964 by R. A. Owens, and a $1,733.27 repayment by Steve Adams of a loan made by petitioner to Steve Adams in 1963 and repaid in that same year. Respondent also conceded he failed to take into account $312 in 1968 representing a state income tax refund for the taxable year 1967, [5] and that petitioner should not be charged with a $1,650 payment to B. B. Sapp in 1967 (thereby reducing total investments and loans to $26,474.29).
OPINION Applicability of the Statute of Limitations
Petitioner contends the assessment of any deficiency for the years 1963 to 1968, inclusive, is barred by the statute of limitations.
Section 6501(a) provides that the amount of any tax must be assessed within three years after the return was filed. We must sustain petitioner's position for the *387 years 1963 to 1965, inclusive, unless the returns were false or fraudulent within the meaning of section 6501(c) (1)[6] *388 ; for the years 1966 and 1967, unless there was a greater than 25 percent omission from gross income within the meaning of section 6501(e)(1) n7 and a timely mailing of the notice of deficiency or there was fraud; and for the taxable year 1968 unless there was a timely mailing of the notice of deficiency or there was fraud. If fraud is proved for any year for all or any part of the underpayment, the 50 percent addition to tax is properly applied to the entire deficiency for that year, section 6653(b), n8 and there is no statutory time limit on the collection of the deficiency and addition to tax for that year. Stone v. Commissioner,56 T.C. 213 (1971). The parties agree the records maintained by petitioner are insufficient to permit an accurate computation of petitioner's income tax liability for 1963 through 1968. The evidence clearly shows Adams made numerous large bank deposits the sources and nature of which were not recorded in any books. Petitioner concedes *389 that he was grossly negligent in maintaining his books and respondent was, therefore, entitled to use the bank deposits and cash expenditures method of income reconstruction in redetermining his gross income, section 446(b), section 1.6001, Income Tax Regs. Where respondent employs this method to determine deficiencies, the burden rests with the taxpayer to show such determination is wrong. Jones v. Commissioner,29 T.C. 601 (1957). However, respondent has the burden of proving fraud, section 7454(a). [9] *390 It has long been held that the existence of fraud is a question of fact to be determined upon consideration of the entire record. The fraud meant is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Estate of Pittard v. Commissioner,69 T.C. 391 (1977). The intention to defraud must be established by clear and convincing evidence. Rule 142(b), Tax Court Rules of Practice and Procedure; Estate of Temple v. Commissioner,67 T.C. 143 (1976). n10 Intermingling Personal Business with Others
One factor considered by the courts in determining whether a taxpayer has fraudulently attempted to evade taxes is attempts to conceal income and cover up false deductions. Many of Adams' transactions involve his attempts to intermingle his personal business with AKA, Inc., or other individuals, one clear indicia of fraud, Spies v. United States,317 U.S. 492 (1943). 1965 Taxable Year
During the years 1965, 1966, and 1967, petitioner received payments of *391 $59,082.02 in connection with the sale of the Pender County land, of which $55,000 represented payment of the purchase price and $4,082.02 represented interest. The only income reported by Adams was $6,682.75 ($27,500 sales price less $20,817.25 basis) in 1965. He never reported any of the interest income for any of the years 1965 through 1967. Petitioner testified that $5,000 was received by Milton Airheart, the remaining 50 percent shareholder of AKA, Inc., reducing his actual receipts to $54,082.02. Petitioner contends that both the purchase and sale of the land were made jointly by AKA, Inc., and himself, and that each was to share 50 percent of the profits. If this was so, he would have reported an amount realized of only $27,500, one-half the $55,000 amount realized on the sale. Although petitioner conceded he received all the proceeds, less $5,000, it is his contention the additional proceeds represented money owed him by Airheart. We note also that petitioner used the entire basis in the property of $20,817.25 in reporting his gain. Although AKA, Inc., also reported gain on the sale in its 1965 return, it is difficult to believe AKA, Inc., was joint owner of the land. *392 Adams and his wife were the owners of record of the property both at the time of purchase and sale. Adams claimed the full amount of basis, did not report interest income (amounting to over $4,082.02 over three years), and received almost the entire proceeds. Furthermore, we do not see how AKA, Inc., could funnel these funds directly to Adams (or to Airheart through Adams) without ignoring AKA, Inc.'s separate corporate existence. [11] *393 By introducing AKA, Inc., into the transaction, Adams confused the nature of the dealings and sought to conceal income received on the sale of the property. 1966 Taxable Year
On March 31, 1966, Adams entered into a lease with the Department of the Army for rental of a portion of land. Adams contends the property on which the maneuvers were held was owned jointly by Adams and Wilton Fish (hereafter Fish), and Fish was entitled to and in fact received the entire proceeds from the Army due to an arrangement he and Fish had worked out because of some other litigation involved with the land. The lease agreement, however, was between the United States and J. Norwood Adams and wife Valeria as fee simple owners. The check was issued to petitioners alone and endorsed by both of them. We find Adams was properly the recipient and owner of the $100 and intentionally failed to report it as income. 1967 Taxable Year
Petitioner next contends he erroneously reported the gain resulting from his 1965 contract with Lonless Fields on the sale of Fields' land in 1967 on his personal tax return for 1967. Adams' position is that he was acting as agent for AKA, Inc., throughout the entire deal, and this was necessary because Fields would not *394 do business with AKA, Inc., due to his dislike of Airheart (the other 50 percent shareholder of AKA, Inc.). In fact, AKA, Inc., did report the gain on its income tax return and Adams received only half the proceeds of the sale. Nonetheless, we are troubled by several facts. The record indicates the $7,000 used to purchase the rights in the tract came from Adams, not from AKA, Inc. Presumably Airheart would have received the additional half of the proceeds from AKA, Inc. (since Adams received half). Such receipt by both Adams and Airheart would have constituted in the least a return of capital and possibly either a dividend or capital gain. The $11,777.50 was not reported on Adams' 1967 income tax return as any type of distribution. We note also AKA, Inc.'s return was not filed until well after the investigation began and no taxes were paid by AKA, Inc., on the gain due to net operating loss carryovers from previous years. Adams has also attempted to reduce his gain from the sale of the Rands Mill Road property on October 5, 1967, by claiming he owned only two-thirds of the property and Harland Adams owned the remaining one-third interest. However, title to the land was in *395 petitioner's name at all times and petitioner received the entire proceeds of the sale. There is nothing in the record, aside from petitioner's uncorroborated testimony, that he was, in fact, only a two-thirds owner. We note, moreover, title was not recorded until August 31, 1967, after the investigation had begun, thereby creating suspicion as to Adams' motives in recording the deed. This is thus another instance of Adams intermingling his affairs with others in an attempt to conceal income. We note also that Adams reported only $300 of the $390 in interest received in 1968 on the note issued by the purchaser on the sale. Next, petitioner contends there were sound business reasons for handling the Bashford sale in 1967 in such a manner that his name never appeared on a check or a deed during the entire series of transactions. The property given Adams by Bashford had been deeded by Bashford to Ransdell in order to transfer a tobacco allotment from it; the property was still recorded in Ransdell's name at the time it was given Adams in order to enable Ransdell to receive the tobacco allotment on the land. Ransdell was thus required to hold the land before deeding it back to Bashford, *396 and Bashford refused to give the land to Adams until the allotment had been cleared through the ASCS office. The sale was made before Adams took possession of the property and Adams planned to loan the money directly to Paul Avert without receiving it. Even accepting Adams' explanation, the transaction clearly made it difficult to trace the gain to petitioner. The sale was made directly from Ransdell to Cochrane, thereby concealing any interest Adams had in the land. The proceeds were paid to Sapp rather than to himself. Sapp was directed to pay certain taxes of the petitioner and distribute the remainder of the proceeds to Paul Avert. He later contacted Sapp and told him Paul Avert did not want the money. His son, Steve, went to pick up the check which was cashed by Sapp and the cash given to Adams. The proceeds were never reported on his 1967 tax return. Adams directed his C.P.A., Matthews, to file an amended return for 1967 and include the gain on the sale but this was never done. However, even the direction to Matthews was not made until after the investigation began and it seems likely the information was provided to Matthews only as a result of the investigation. Failure *397 to Report Income from Known Sources
In several instances Adams admitted to receiving income but failing to report it. These include the ASCS payments from 1964 to 1966, inclusive, interest on his savings account, rent received from the French Creek Hunting Club, the bad debt recovery in 1965, and interest on the Sam Cummings notes and the Bennie Daniel transaction. These amounts are not in dispute, and the understatement resulting from these items totals: 1964
1965
1966
1967
1968
ASCS
$2,821.81
$1,789.12
$3,736.82 [12]
James Adams -
276.33
$24.45
$10.46
interest
Sam Cummings
229.00
184.00
138.00
- interest
French Creek
Hunting Club
100.00
Willie Sanders
1,145.00
bad debt
Bennie P.
1,112.50
Daniel
Overstated
900.00
expense -
Bill Bentley
Overstated
1,150.00
expense -
Baxter Lee
Total
$3,050.81
$6,380.62
$4,151.15
$24.45
$10.46
Adams repeatedly denied he ever intentionally failed to report these amounts as income.For example, Adams admitted he should have reported the recovery in 1965 of the Sanders debt deduction in 1965, section 1.166-1(f), Income Tax Regs. He offered no explanation for the failure to do so, except to say on brief he erroneously *398 deducted the amount in 1965 due to his general lack of knowledge of the income tax laws. While we could accept that statement, Adams must have been aware the bad debt was no longer bad, and at the least he should have filed an amended return for 1964 (although this would not have been the proper treatment, it would have indicated a desire to reveal the recovery) or reported it to his accountant. He did neither and we can infer only that he had no intent whatsoever to report the recovery. Additionally, respondent contends petitioner reported the sale of the Bladen County land on his 1966 return solely in response to the audit; if it had not been for the audit, the sale would never have been reported. To buttress this, respondent points out the sale should properly have been reported in 1965. Petitioner admits the sale should have been so reported, but testified he thought the correct year of inclusion was 1966, the year of final payment on the sale. Payment of the final $1,987.50 was withheld by the attorney handling the transaction because of a dispute between petitioner and the auction company which handled the sale over the auction company's fee. If Adams truly believed the *399 correct year of inclusion to have been 1966, one would expect Adams not to have told his C.P.A. about the transaction until after the investigation started in December 1966 since Matthews did not prepare any year's return until the following January through April. However, we note petitioner often sold property on an installment basis and reported the gain in the year of sale. Taken in context with petitioner's conduct throughout the years in question and during the investigation (in particular, the Bashford land and Baxter Lee transactions), we believe respondent is correct in viewing Adams' reporting of the sale as a response to the audit, thereby supporting the view that Adams was trying to evade taxes. On January 22, 1966, B. B. Sapp paid Adams $1,000. Adams did not report the $1,000 Sapp check on his income tax return for 1966, denying it was a commission or for that matter anything else which might have been a taxable receipt (although he did not ask to use the $1,000 to reduce the gross receipts in the bank deposits and expenditures computation). Adams testified he simply did not recall the reason why Sapp issued the check to him. Nor could the agents investigating Adams' *400 returns determine precisely the transaction to which the check related. However, Sapp is a real estate agent in Raleigh, N.C., and had a number of real estate transactions involving Adams. The check plainly states it was issued as a commission for the sale of the Bashford land; therefore, the fact that the agents could not tie it into a specific transaction does not refute the evidence that the check was a commission. Moreover, we assume that had the check been presented to Matthews, he too would have categorized it as commission. We believe, therefore, that Adams must never have given the check to Matthews, thereby concealing the $1,000. When the disputed transactions involving AKA, Inc., B. B. Sapp, etc., are added into the computation determining the understatement, the figures show even more unreported income: 1964
1965
1966
1967
1968
Interest - Edwin Smith
$ 31.84
(Pender County)
Interest - Southern Furni-
$1,022.18
ture Co. (Pender County)
Interest - C. L. Mackie
$ 2,749.00
(Pender County)
Interest - John Smith
$ 90.00
(Rand Mill Road)
Department of the Army
100.00
Sale of Pender County Land
14,500.00
Sale of Rands Mill Road
4,469.34
Sale of Bladen County Land
25,240.93
Commission from B. B. Sapp
1,000.00
Lonless Fields Transaction
4,085.53
Bashford Land Transaction
7,715.65
Total
0
$40,051.77
$2,122.18
$19,019.52
$ 90.00
Subtotal from previous
$3,050.81
6,380.62
4,151.15
24.45
10.46
table
Total Understatement
$3,050.81
$46,432.39
$6,273.33
$19,043.97
$100.46
It *401 is well settled that evidence of a consistent pattern of underreporting substantial amounts of income supports an inference of fraud. Holland v. United States,348 U.S. 121 (1954). Petitioner's intent to evade at least a portion of his taxes is evidenced by his reporting negative taxable income for five of the six years in question, and only a nominal amount in the taxable year 1967. The correct income from known sources for each of the years 1964 through 1967 greatly exceeds the amount reported by petitioner. His understatements of income were so large and regular over a period of these four years there is no escape from the inference of fraud. [13]
Failure to Cooperate During Audit
We note also that failure by the taxpayer to cooperate during an investigation of his tax liability is evidence indicative of fraud. Estate of Beck v. Commissioner,56 T.C. 297 (1971). The record shows petitioner's conduct during respondent's investigation was designed to inhibit the investigation. Even *402 some of Adams' corroborating evidence was withheld from respondent and produced only at trial. The most blatant example of this revolves around the James Adams bank account. Although petitioner normally goes by the name Norwood Adams or J. Norwood Adams and had a savings account at First Citizens Bank & Trust Co. in the name of J. Norwood Adams, in 1966 he opened a second savings account at First Citizens Bank & Trust Co. in the name of James Adams and deposited in this account approximately $24,000 of the proceeds received upon the sale in 1965 of 1,579 acres of land located in Bladen County, N.C. The bank records relating to this account were not turned over to respondent's agents at the time they obtained petitioner's other records and it was only after the agents discovered the account while going through bank microfilm records that petitioner admitted he had such an account. Additionally, Adams reported interest income from this account in only one year, 1965. Adams testified he opened the account under "James Adams" in order to retain some privacy for his business dealings from his wife. This may be true, but it does not explain why he did not tell the agents about the *403 account when they asked for his bank records. This at least indicates that Adams was being evasive about large amounts of cash he knew he had and was trying to prevent the agents from discovering it, even if there was no fraudulent intent at the start. Overstatement of Deductions in 1965
It is also clear that for purpose of fraud an understatement of income can be accomplished by an overstatement of deductions. Estate of Temple v. Commissioner,supra.
In 1965 petitioner issued a check for $900 to Bill Bentley in payment for work done in relocating a house owned by AKA, Inc. The payment to Bill Bentley was deducted by petitioner as a farm expense on his 1965 income tax return. There are no notations appearing on the check indicating the purpose for which it was issued. Matthews testified it was his normal procedure to go through petitioner's cancelled checks and deposit tickets and segregate his checks into deductible and nondeductible expenditures. He also stated that if it was not clear from examination of the check itself that an expenditure was deductible, he, or a member of his office, would contact petitioner for the purpose of determining the nature of the check. Since *404 there were no notations on the Bentley check which would indicate its nature, it is reasonable to infer that Matthews would have asked petitioner about the nature of the check and would have been told to deduct the expenditure as an agricultural expense. Another example of a false deduction claimed by petitioner involves the $1,150 payment in 1965 to Baxter Lee for doing grading work for AKA, Inc.When the special agent examined the cancelled check on bank microfilm, the check contained the notation "bulldozer work farm" in the left bottom corner. When the same check was found in petitioner's bank records, it was discovered that the notation had been changed by insertion of the word "King" in ink before the word "farm." The "K" was later changed to an "R" in pencil to change it to "Ring farm." The grading work was actually done on the King farm which was owned by AKA, Inc. Again, the clear implication is that the notations on the check were changed in order to make it appear the deduction was properly made by Adams rather than by AKA, Inc., which owned the King farm. Adams testified he did not write over the word "King" to change it to "Ring" nor did he know who did or why it was *405 written over in that way. It is his contention that Matthews would have deducted the amount as a personal farm expense of Adams regardless of whether the check was denoted "Ring" or "King" because Matthews was unaware AKA, Inc., owned the King farm and would have assumed it was Adams' personal property; therefore, there was no need to change the notation. This, however, tends to prove respondent's position. Matthews would have deducted the check as an expenditure of Adams'--the change to "Ring" could have only misled the agents into believing the deduction was proper. How or why anyone else would have changed "King" to "Ring" escapes not only us but Adams as well; this being only another instance of the intertwining of AKA, Inc., and Adams. Understatement of Income in 1963 and 1968
For the taxable years 1963 and 1968, however, there are no specific transactions in which petitioner engaged in schemes which would hide his income nor is there any income from known sources which Adams failed to report (with the exception of $100 in 1968) or any known over-statements of deductions. Respondent, therefore, must rely only upon his recomputation of income to show a fraudulent understatement *406 of income in those two years. In his computation as set forth in the statutory notices, respondent determined that Adams had unreported taxable income of $67,967.87 in 1963 and $20,614.56 in 1968. Petitioner stipulated to all the amounts shown on respondent's schedule for these years but contends that he had nontaxable sources of income which reduce the understatement. However, even though we reduce these amounts somewhat in our determination of the amount of deficiency, Adams' understatement is still well over $50,000 in 1963 and over $18,000 in 1968. In fact, petitioner admits by his own calculations to have understated his income by $6,078.97 in 1968. Mindful that respondent cannot meet his burden of proof in establishing fraud on the basis of petitioner's failure to discharge the burden of proving error in the deficiencies, we are nonetheless convinced that petitioner received substantial taxable income in 1963 and 1968 in excess of that reported on his returns and in each of those years a part of the deficiency is attributable to fraud with intent to evade taxes. We do not believe negligence alone can explain the discrepancies as petitioner contends. Since we have found *407 fraud with intent to evade taxes in each of the years in question, the statute of limitations does not bar assessment in any of those years. Therefore, we need not determine the remaining arguments with respect to that issue. Finally, petitioner contends respondent's agents did not pursue their investigation of his tax liability on a fair and impartial manner in keeping with the requirements of Rev. Proc. 64-22, 1964-1 C.B. (Part 1) 689. Based on a review of the entire record, we do not believe petitioner is in need of any special protection by the Court. Failure to give credit to Adams for items later conceded by respondent or found by the Court to be nontaxable receipts and failure to believe petitioner's statements are not synonymous with prejudicial conduct. See Greenberg's Express, Inc. v. Commissioner,62 T.C. 324 (1974). Determination of Amount of Deficiency Additional Nontaxable Receipts
Petitioner contends respondent failed to give him credit for the following nontaxable receipts as having been received in each of the respective years: 1963
1964
1965
1966
1967
1968
Carson Costs note collection
$ 5,000
$ 5,000
"Suitt deal" collection
$ 4,500
Federal income tax refund
$ 1,392
N.C. income tax refund
312
Lighting Inc. stock sale proceeds
3,500
Wayne Coats account collection
9,849
Robert Long note collection
1,000
$ 1,000
3,00
$ 3,000
Nelson Currin note collection
2,000
2,000
2,000
2,000
2,000
300
Jimmy Partin note collection
400
Steve Adams wiring repayment
1,733
Coats and Adams distribution
720
Frank Owen note collection
2,200
R. A. Owen note collection
5,000
Oil property sale proceeds
737
Sale of tobacco allotment
2,800
Coats and Adams note reimbursement
833
McLean Hall option reimbursement
5,000
Tennessee land sale proceeds
10,000
M. Hobbs loan repayment
12,000
Steve Adams house sale proceeds
5,000
Steve Adams loan from savings
2,000
948 [1]
Steve Adams ASCS payments
305
Auto sale proceeds
225
Wilton Fish loan repayment
15,000
1,140
Sutton farm payment reimbursement
2,556
2,557
J. Milton Airheart collection
8,525
Airheart Ins. Agency collection
2,200
C&D Insurance distributions
1,000
500
1,500
750
2,250
1,050
Sam Cummings note collections
769
769
769
$16,390
$42,099
$17,630
$36,276
$12,679
$14,015
*408 Petitioner also contends he received a collection of $1,112.50 on a deed of trust in 1965 which was reported on his 1965 income tax return and for which he was not given credit by respondent. Several of the items listed by petitioner as non-income items which he was not given credit for were in fact credited either in the original bank deposits and cash expenditures computation, in the stipulation of facts, or in respondent's brief. The C&D Insurance, Inc., distributions were listed by respondent and subtracted from the total bank deposits to arrive at total receipts to which cash expenditures were added. The repayment by Steve Adams to petitioner in 1963 of a $2,000 loan was reflected as a withdrawal from savings and provides the same net effect as treatment as a loan proceed. The same is true regarding the $948.47 loan made by Sandy to petitioner. Adams was given credit for the $2,200 Airheart collection in 1966: the $5,200 loan principal payment received in that year consists of $3,000 received from AKA, Inc., and the $2,200 Airheart note. The proceeds from the sale of the automobile in 1967 was picked *409 up by respondent as a real estate sale and Schedule D receipt. Respondent conceded that he failed to give credit for the $400 payment by Jimmy Partin and the $1,733.27 Steve Adams wiring repayment in 1963, for the $2,200 payment on the Frank Owens note and the $5,000 payment on the R. A. Owens note in 1964, and for the Sam Cummings note collections for the years 1964 through 1966. However, although respondent concedes Adams did not receive credit for the Sam Cummings note repayments, the reason is that he did not treat the loan for which the note was given as an expenditure; if credit is given for the repayment, a charge must be made for the loan if the loan was made in 1963. The dispute thus centers on when the loan was made.Adams testified the loan was made in 1959. However, the note was given Adams by Cummings on December 4, 1963, bearing six percent interest. Further, we note the six percent interest payment in 1964 amounted to $229 (or six percent of $3,845).If the loan was made in 1959, the principal would have been earning interest at six percent. Therefore, the principal and interest would both be larger than the amounts actually received. We find, accordingly, the *410 loan was entered into in 1963 and respondent need not give petitioner credit for the Cummings note repayments. The Federal income tax refund for 1967 was credited by respondent in 1968 as a reduction in his 1968 personal living expenses. Respondent conceded he failed to give credit for the $312 North Carolina state income tax refund for 1967, which properly should reduce the petitioner's expenses in 1968, the year received, and not 1967 as Adams believes. Based on the record more fully set out in the findings of fact, we believe petitioner produced sufficient evidence to sustain his burden of proof as to receipt of the following nontaxable receipts: Nelson Currin note repayments for the years 1963 through 1968 [14] and Carson Coats note collections of $5,000 each in the years 1963 and 1964. We need not reach petitioner's claims in several other instances. If we were to assume petitioner received payment of $833.34 in 1964 on a loan due him *411 by Wayne Coats and R. E. Adams, the payment still would not properly be reflected on respondent's computation. Coats and R. E. Adams had a note outstanding from First Citizens Bank & Trust Co. for $833.34. Petitioner paid this amount and was reimbursed by Coats and R. E. Adams a few days later.Since the expenditure was not included by respondent, if petitioner is given credit for the repayment, he must also be charged with the expenditure. Petitioner contends he advanced Marvin C. Hobbs $12,000 in 1966 in order to save Hobbs' farm. After Hobbs obtained refinancing through the F.H.A., he reimbursed the $12,000 to petitioner in the same year. Here again, respondent considered neither transaction in his computation. The advance would have increased the total outlays while the repayment would have decreased total net cash amounts. Therefore, we need not decide whether the repayment was in fact made as this, too, would be a wash.
Similarly, were we to give credit for the 1965 $1,112.50 collection on a deed of trust, we would have to charge petitioner in 1963 with having made an expenditure for its purchase since it appears from the record respondent did not charge Adams for this investment. *412 Adams and Coats were equal partners in a residential building construction business. The partnership was liquidated and the assets, consisting solely of cash and accounts receivable, were distributed to both partners in proportion to their interests. Adams received $535 in accounts receivable and $184.93 cash. The parties dispute whether the distribution was made in 1962 or 1963. We note a taxpayer's returns are generally self-serving, but we see no reason for Adams to have falsified the returns when filed nor has respondent so argued, and on the basis of the partnership returns for 1962 and 1963, which indicate the liquidation occurred on January 1, 1963, and there was $369.95 in cash and $1,070 in accounts receivable on December 31, 1962, we find the distribution was made in 1963. However, receipt of the accounts receivable would not properly be reflected in respondent's computation. Since the accounts receivable had a zero basis to the partnership, upon liquidation of his interest, Adams would take a zero basis in the receivables regardless of his basis in the partnership, sections 732(b) and 732(c); section 1.732-1(c)(2), example (2), Income Tax Regs. Any collection on the *413 notes would, therefore, be taxable income. Petitioner should be given credit for the $184.93 cash received as a nontaxable receipt for 1963. The parties stipulated petitioner loaned Wilton Fish $15,000 in 1964, and Adams was charged for having made this loan on the bank deposits and expenditures computation. Petitioner testified the loan was repaid in 1964 and never deducted the loan as a bad debt on his income tax returns for any of the years 1964 through 1968. We find on the particular facts in this case and noting Adams' willingness to deduct bad debts which were not bad and take deductions which were not his, we believe that he would certainly have deducted the loan if it had not been repaid, and that this is sufficient corroborative evidence to support Adams' testimony that the $15,000 was repaid. This should, therefore, be taken into account to reduce Adams' understatement of income. As to the remainder of petitioner's contentions, he generally presented no evidence other than his own uncorroborated testimony to support the conclusion the amounts were actually received.In a few instances, there was some corroborating testimony, but such testimony was generally vague and *414 not supported by any additional evidence. We do not find such testimony is sufficiently credible to support petitioner's burden of proof. Total Bank Deposits
Petitioner also contests certain funds charged by respondent as belonging to him. Petitioner denies funds deposited in the account of his daughter, Sandy Adams--who was about 15 years old in 1963--with Home Savings & Loan Association, Dunn, N.C., in 1963 were made entirely by him. Rather, he contends half were made by him and half were made by Wayne Coats, Adams' brother-in-law and Sandy's uncle, from proceeds generated by Electric Sales & Service. He also denies making any deposits credited to the account of Sandy with First Citizens Bank & Trust during the years 1963 through 1968; rather, he contends the money in the account was earned by Sandy from her working on petitioner's farm. [15] *415 Finally petitioner contests the finding that the entire deposit in the joint account of petitioner and Wayne Coats was made by him, arguing that one-half of the amount was deposited and owned by Coats. Petitioner offered no proof to show who deposited any of the funds in any of the accounts, nor did he produce evidence as to the disposition ultimately made of the funds. Such corroborating evidence as petitioner's returns also tends to disprove Adams' testimony that Sandy's deposits were made from earnings on petitioner's farms. Only in 1963 did petitioner show labor expenses on his Schedule F (farm income and expenses) equal to Sandy's deposits. [16] If Sandy were an employee, such expenses would properly be deductible. We find respondent's determination of total bank deposits for all years must stand. Increase in Cash on Hand
Petitioner disputes respondent's finding that he had zero cash on hand at December 31, 1962, and January 1, 1963, contending he had $53,486.29. For the remaining years, petitioner accepts respondent's determination. Petitioner testified he was owed *416 $66,000 by Cary Dupree, which was repaid in two installments, one of $25,000 in early 1961 and one of $43,000 (including interest) in early 1962, largely contributing to the cash on hand he had at December 31, 1962. Petitioner also offered into evidence a detailed analysis of his cash flows for 1961 and 1962, showing how he arrived at his exact amount. However, such evidence is of little probative value. During the investigation of the years in question, Adams told the agents he had no cash on hand, that the last time he had any money was when he made the loan to Cary Dupree, and "he would not have enough money to buy a suit of clothes if his wife were to die." Adams testified that if he made the statement, he was joking. Based on this evidence, we do not believe petitioner met his burden of proof, and we agree with respondent's determination that there was no cash hoard at December 31, 1962. Business Expenses Incurred
In addition, petitioner claims respondent failed to give him credit for the following business expenses incurred by petitioner but not deducted by petitioner on his returns: 1965
1966
Purchase of tobacco
$ 650
Commission to Haywood Hall
$100.00
Commission to Wayne C. Coats
1,000
Brewer and Gilliam legal fee
504.96
Total
$1,650
$604.96
Respondent *417 concedes Adams should properly be allowed to deduct the legal fee; as to the remainder of the items, respondent contends petitioner has not established sufficient facts in the record to prove he is entitled to the deductions. The amounts paid by petitioner are not in dispute and were charged as nondeductible expenditures made by Adams in respondent's computation. We must agree with respondent. There is nothing in the record from which we may ascertain the true nature of either the commissions (which may, for example, represent nondeductible capital expenditures) or the purchase of tobacco (which may represent produce held primarily for sale to customers). Gain on Sales and Proceeds Attributed to Adams
Respondent charged Adams with the entire gain from the sale of 22.12 acres of land located in Wake County, N.C., to John Smith in 1967 (th Rands Mill Road property). Petitioner contends he owned only a two-thirds interest in the land and received only two-thirds of the proceeds. Petitioner further contends the proper basis of the land was $6,500 rather than the $3,500 basis asserted by respondent. Respondent also charged petitioner with the sales of the Pender County land and the *418 Lonless Fields tract, both in 1965. Petitioner contends these sales were made by and are attributable at least in part to AKA, Inc. Petitioner next contends respondent erroneously charged him with the receipt of $100 as rent received from the U.S. Army which he received only as conduit for Wilton Fish. There is also in dispute the amount of gain on the sale of the Bladen County land in 1965; respondent determined gain to be $25,240.93 while petitioner claims the actual gain on the sale was $24,407.60. Petitioner further denies he ever received a $1,000 commission from B.B. Sapp, Sr., in 1966. Many of these issues have been dealt with previously. We already determined AKA, Inc., was neither joint owner of the Pender County land nor full owner of the Lonless Fields tract. Therefore, we find in favor of respondent's determination that petitioner understated his gain on the Lonless Fields tract by $4,085.53 (amount realized of $22,863.09 less $18,777.56 sales price). We also find petitioner understated his gain in 1965 from the Pender County land by $14,500. [17] We have earlier held Adams not acting as conduit for Wilton Fish in receiving the $100 check from the Department of the *419 Army as rental and the $1,000 check received by Adams from B.B. Sapp in 1966 was, in fact, for commission. As to the Bladen County land, neither party offered anything into evidence to support their contentions of the proper amount of gain on the sale. Since the burden of proof rests with petitioner, respondent's determination must stand. Welch v. Helvering,290 U.S. 111 (1933). Similarly, although we already determined petitioner owned the entire Rands Mill Road property, there is in dispute the basis of the property. Since petitioner produced no records indicating the cost of the property was greater than $3,500, we must also decide for respondent on this issue. 1964 Real Estate Investment
Petitioner contends the total amount of real estate investments made during 1964 amounted to $85,212.07. Respondent determined the proper amount to be $90,212.07. [18] The dispute over the $5,000 centers on whether a certain payment was ever made by Adams to Lonless Fields on an option agreement dated April 25, 1964. The option was payable *420 in two installments, one due immediately for $2,500 which was paid by check and to which there is no dispute and $5,000 due August 1, 1964. Adams denies ever making the payment but did not ask Fields to testify that payment was not made. Respondent's evidence consists solely of the option agreement itself which indicates the $5,000 was due. Petitioner has failed to meet his burden of proof to show payment was not made. Investments and Loans - 1967
Respondent charged petitioner with making a $22,863 loan in 1967 which petitioner denies making. There is no dispute as to the additional $3,611.20 loans made by Adams, and respondent conceded petitioner should not be charged with having made a payment of $1,650 to B.B. *421 Sapp. The loan involves the Lonless Fields-Adams transaction. Respondent determined that proceeds received by Adams but then signed over to AKA, Inc., constituted a loan made by Adams to AKA, Inc. Since we found previously the entire transaction was properly treated as Adams', the donation to AKA, Inc., of the $22,863.09 must be treated as either a loan or a contribution to capital. We do not believe it is reasonable to treat it as a contribution to AKA, Inc.'s capital, nor do we think such treatment was desired by Adams. Accordingly, we find Adams did make a loan to AKA, Inc., of $22,863.09 and was properly charged as such. However, we find further that the $11,777.50 issued to Adams by AKA, Inc., on December 1, 1967, representing half the proceeds of the sale, was a return on the loan and should be subtracted as a nontaxable note payment received (or simply netted against the $22,863.09). Dispute over Amount of Expenditure
Respondent charged petitioner with having made payment of $2,000 in 1963 on a note signed by petitioner on the front but signed by Jedd Barbour on the back. Adams contends Barbour paid off the note, but there is no evidence to support this claim and it *422 must be rejected. Dispute in Total Outlays
Respondent concedes certain outlays on the bank deposits and cash expenditures were inaccurately charged to petitioner as cash expenditures. For the taxable year 1963, $159.26 of the $17,242.44 outlays reflected on petitioner's return represented depletion, a noncash expenditure, and, therefore, should be credited to petitioner. For the taxable year 1967, included in the $15,321.48 outlays reflected on petitioner's return is $1,500 representing auto expenses (15,000 miles at ten cents per mile). Respondent concedes petitioner is entitled to a $750 credit as a noncash expenditure reflecting depreciation, but that there is no evidence in the record to sustain the remaining $750 as a noncash expenditure. Indeed, the use of the simplified method includes not only depreciation, but also such cash expenditures as gasoline, oil, repairs, license tags, and insurance. Rev. Proc. 66-10, 1966-1 C.B. 622. We hold petitioner should be given credit for only $750. Did Real Estate Sales Produce Ordinary Income
Section 1221 provides, in part: SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held *423 by the taxpayer (whether or not connected with his trade or business), but does not include-- (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; The question of whether land is held primarily for sale to customers in the ordinary course of a taxpayer's trade or business or for investment is one of fact, to be determined on a case-by-case, property-by-property approach.To aid in deciding this question, the courts give consideration to several factors: the purpose or reason for the taxpayer's acquisition and disposition of the property; the continuity of sales or sales-related activity over a period of time; the number and frequency of sales; acquisition of adjacent land; the extent to which the taxpayer or his agents engaged in sales activity by developing or improving the property; soliciting customers, and advertising; the substantiality of the sales when compared to other sources of the taxpayer's income. Oace v. Commissioner,39 T.C. 743 (1963). *424 Additional factors include obtaining the services of a real estate agent, broker or dealer to aid in the disposition of the property and the taxpayer's status as a real estate agent, dealer or broker, Mitchell v. Commissioner,47 T.C. 120 (1966); the proximity of sale to purchase, Pointer v. Commissioner,48 T.C. 906 (1967); the use to which the properties were put during the period of ownership; and the use of a business office for the sale of the properties. None of these factors are determinative and the question must be examined in the light of all pertinent factors and particularly the facts of the individual case. Thrift v. Commissioner,15 T.C. 366 (1950). During the taxable years in issue, petitioner made the following sales of real estate: Date
Date
Sales Year
Property
Acquired
Sold
Cost
Price
Net Gain
1963
56-1/2 acres
1960/1962
2-13-63
$ 2,145.33
$ 5,000
$ 2,854.67
1964
Paul Creech
Jan. 1963
Jan. 1964
68,700.00
85,250
16,550.00
land
1965
Pender County
1963
Apr. 1965
33,817.25
55,000
21,182.75 [1]
1,200 acres
1965
Bladen County
1959/1962
12-7-65
53,982.55
79,500
25,517.45 [1]
1,579 acres
1966
Apartment
1965
1-26-66
6,000.00
7,000
1,000.00
Building
1967
Rands Mill
1960
10-11-67
4,341.26
11,500
7,158.74 [1]
Road
1968
Land
June 1967
June 1968
2,250.00
5,300
3,050.00
1968
Land
Aug. 1967
June 1968
956.00
1,000
44.00
*425 The limited number of sales in each year is cited by petitioner as proof he was not a real estate dealer. The decided cases are of little aid in establishing the frequency and continuity of sales sufficient to constitute a regular course of business. Rather than apply a mechanical test, while keeping in mind the number of sales here is admittedly small, one approach used is to determine whether the taxpayer was engaged in activity commonly associated with a particular business, Pointer v. Commissioner,supra.
Initially, we note Adams did not have a real estate license, although it is not essential Adams have a license or advertise if he is well known as one who deals in property. Certain testimony of Adams at trial is relied on heavily by respondent in this instance: Q Isn't it a fact, Mr. Adams, that you're very well known in your particular locality -- A Yes sir. Q -- as far as being -- as entering into real estate transactions? A I'm a horse trader. Q People know that you're a horse trader, a so-called horse trader? A Yes sir. That's right. Q And they know if they're *426 looking for some land, they can come to you and if you've got it, you'll sell it or if you don't have it, you may be able to find it for them? A If I could, I would. Yeah. Yes siree. Yes sir. Respondent relies mainly on a comparison of petitioner's income from sales of property to his other income as proof of Adams' being engaged in the real estate business. The following schedule sets forth a comparison of the net income from known sources other than from sales and dealings in real estate to his net income from those sales and dealings: [19]
INCOME OTHER THAN FROM SALES OF AND DEALINGS IN REAL ESTATE
1963
1964
1965
1966
1967
1968
Reported on Returns
Schedule B
Interest
$ 303.39
$ 1,263.55
$ 53.49
$ 33.74
$ 367.99
Rents, royalties, pensions, etc.
3,131.22
8,273.09
7,469.97
$12,393.91
14,109.10
8,215.95
Schedule C (business income)
127.12
1,988.75
14.20
Schedule F (farm income)
470.54
Miscellaneous
7,300.00
20.00
382.00
Miscellaneous
7,300.00
Not Reported on Returns
ASCS payments
2,821.81
1,789.12
3,736.82
Interest
229.00
494.84
1,436.51
2,773.45
100.46
Rent
100.00
100.00
Total
$10,861.73
$14,576.20
$9,921.62
$18,137.78
$16,936.29
$9,066.40
INCOME FROM SALES OF AND DEALINGS IN LAND
Gains from Dealings in Land
Commission, B.B. Sapp
$1,000.00
Bennie P. Daniel - forbearance
in submitting upset bid
$ 1,112.50
Lonless Fields
$15,863.09
J.H. Cochrane - Bashford land
7,715.65
Gains from Sale of Property
from Previous Schedule
$2,854.67
$16,550.00
$46,700.20
$1,000.00
$ 7,158.74
$3,094.00
Total
$2,854.67
$16,550.00
$47,812.70
$2,000.00
$30,737.48
$3,094.00
*427 However, neither petitioner's testimony nor respondent's income comparison proves as much as respondent desires. Adams was engaged in many businesses including farming, electrical contracting, and merchandising, and he had interests in several different partnerships and corporations. The comparison of income, while highly relevant, fails to show the amount of activity generated in other areas such as farming since in five of the six years in question, Adams had a loss from such activity. [20] It is also a comparison of known sources of income outside real estate dealings with real estate gains. Adams fraudulently concealed most of his income in the years in question, and when the total net income from all sources is compared with the net income from real estate gains, the figures are heavily proportionate in favor of nonreal estate transactions in all years except 1965. Thus, we do not believe virtually all of petitioner's principal business endeavors revolved around his dealings in real estate as respondent contends. *428 It is true petitioner's efforts in real estate were not confined to actual purchases and sales, and he derived profits in dealings in which he was neither a buyer nor a seller. These are listed in the comparison schedule set forth previously: the commission he received from B.B. Sapp in 1966, his participation in the B.P. Daniel forbearance, and the Lonless Fields and Bashford land deals. Unfortunately, however, there is little in the record from which we can ascertain how the properties were used, if at all, in the interim between purchase and sale, or how much activity was generated by Adams in attempting to sell the properties. What testimony there is tends to support Adams' contention that he did not advertise nor solicit sales. We do note, though, that petitioner's reported gross rent income during the years in question was $500 in 1963, $396.67 in 1964, $918.75 in 1965, $1,285 in 1966, $1,202.50 in 1967, and $821.25 in 1968. Additionally, several of the parcels of property sold were held for two or three years, and one was held for as long as seven years. Petitioner testified he bought property for farm investment, and except for the apartment building, the evidence tends *429 to support this: he bought land in large acreage and sold it as a single unit without development. On the basis of the evidence and record before us, we find petitioner has met his burden of proof and has shown he was not engaged in the business of selling real estate. Decisions will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 in effect during the taxable years in issue. n2 Upon joint motion of the parties, these cases were consolidated for trial, briefing, and opinion.↩
3. In docket No. 7034-72, J. Norwood Adams is the sole petitioner. Valeria Adams is a petitioner herein by reason of having filed a joint return with her husband. Respondent concedes that Valeria is not liable for the fraud penalty. Hereafter, references to Adams or to petitioner are solely to J. Norwood Adams.
1. All of the bank deposits listed herein include interest credited to the savings accounts listed with the exception of Sandy Adams' account. n2 The parties stipulated that the proper amount to be reflected in 1965 as a 1120S distribution should be $1,500, not $1,033.87. n3 Included in this amount for 1964 is $12,033.50 cash proceeds from the sale of the Paul Creech farm, purchased January 21, 1963, for $64,100 and sold January 21, 1964, for $85,250. The examining agent determined that land sold by petitioner during the years in issue was held in the ordinary course of business and gain was thereby computed as a separate adjustment in the notice of deficiency. Since the gain is included as a separate adjustment, the proceeds received from the sales of land are treated as a nontaxable source of income. Adams did not have a real estate license.
[4] This figure should be $92,771.42; respondent made a mathematical error in computing this in the notice of deficiency.However, respondent specifically asked us not to increase the deficiency due to the error. Respondent conceded that this should be a nontaxable item, although it is far from clear on the record why this should be so.
[5]↩ This figure should be $33,613.32 for 1965. The $33,612.32 was due to an addition error and we so hold.
1. All of the bank deposits listed herein include interest credited to the savings accounts listed with the exception of Sandy Adams' account. n2 Included in this amount for 1968 are two parcels of land, one purchased June 1967 for $2,250 and sold on July 3, 1968, for $5,300, and one purchased on August 5, 1967, for $956 and sold on June 29, 1968, for $1,000.↩
6. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. * * *
(c) Exceptions.-- (1) False return.--In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time. n7 (e) Substantial Omission of Items.--Except as otherwise provided in subsection (c)-- (1) Income taxes.--If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. * * * n8 SEC. 6653. FAILURE TO PAY TAX. * * *
(b) Fraud.-- If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013↩, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.
9. SEC. 7454. BURDEN OF PROOF IN FRAUD, FOUNDATION MANAGER, AND TRANSFEREE CASES. (a) Fraud.--In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary. n10 Petitioner pleaded nolo contendere in 1966 for perjury under section 7206 for the years 1958, 1959, and 1960. We have not considered this evidence in reaching our decision herein. We note that there may be a question as to the admissibility of such a conviction even for such limited purposes of weighing credibility. Compare Rules 410 and 609(a), Federal Rules of Evidence. See also Kilgore v. United States,467 F. 2d 22 (5th Cir. 1972); Kilpatrick v. Commissioner,227 F. 2d 240, 243 (5th Cir. 1955), affg. 22 T.C. 446 (1954); Sporck v. Commissioner,T.C. Memo. 1978-79↩ at fn. 4.
11. We note AKA, Inc., paid no taxes during the entire period August 1, 1964, through July 31, 1968, due to operating losses and net operating loss carryovers. It is reasonable to assume AKA, Inc., had no earnings and profits, and any distributions would be a return of capital (or capital gain) to its stockholders. A distribution to Airheart alone would have thus constituted a redemption to him, decreasing his ownership below 50 percent. This did not in fact occur. And, if AKA, Inc., did have earnings and profits, the amount distributed would have been a dividend. If so, the distribution should have gone evenly to both Adams and Airheart, yet Adams never reported dividend income in any years from AKA, Inc.
12. Includes two ASCS checks received by Jack Hall but then signed and given to Adams↩
13. ↩
Taxable Income
Total Understatement Year
Reported on Return
from Known Source
1963
[2,531.28)
1964
(3,594.63)
$ 3,050.81
1965
(7,476.77)
46,432.39
1966
(5,604.90)
6,273.33
1967
479.90
19,043.97
1968
(3,305.98)
100.46
1. We assume petitioner meant to refer to the $948.47 "loan" from Sandy Adams.↩
14. While it is true Adams never reported gain on the farm, which properly should have been reported in 1962, this does not change the fact that the payments in later years reflected a return of capital and should not be taxed in those later years.↩
15. The determination of this issue will not affect the outcome of credit for the 1964 loan made by Sandy Adams to petitioner. Petitioner was given credit for the loan as a withdrawal from savings.Regardless of whether Sandy's account is charged to petitioner, giving credit as a withdrawal has the same effect of treating it as a loan.
16. Labor expenses deducted on petitioner's returns: ↩ 1963
1964
1965
1966
1967
1968 $157l.50
$78.00
$42.50
$60.75
$78.50
$536.50
17. Petitioner reported $6,682.75 gain from the sale. The correct gain is $21,182.75 ($55,000 amount realized less $33,817.25 basis and selling expenses).↩
18. There is an additional $2,559.35 reflected in the computation account due to an investment of $2,459.35 in Camelot Development, Inc., and the purchase on an automobile for $100, and to which there is no dispute. Respondent's computation shows a total of $92,071.42.This is in error; the proper amount, using respondent's figures should be $92,771.42. Respondent asked not to be credited with the $700 error and we, therefore, do not increase the deficiency on this basis.↩
1. These amounts are disputed by petitioner. However, we have already found for the respondent on these issues.↩
19. This schedule differs from respondent's in the following ways: respondent failed to give credit for $7,300 in 1963 representing gains from the sale of property other than real estate; Adams had net income of $470.54 from farming activities in 1966, not zero, and had a $4,500 loss in 1968, not $4,500 net income; income on Schedule B from rents, royalties, etc., in 1968 was reported as $8,215.95, not $821.95.↩
20. ↩ Schedule F - farm income
1963
1964
1965
1966
1967
1968
Sale of livestock and
$18,779.26
$19,227.50
$13,145.97
produce raised and
other farm income
Farm Expenses
(16,548.26)
(17,821.52)
(13,381.13)
(14,995.21)
(14,109.35)
(15,791.41)
Depreciation on farm
(2,629.63)
(3,075.39)
(2,738.67)
(2,505.18)
(4,364.67)
(4,660.51)
Farm Net Income
[398.63)
[1,619.41)
[2,973.83)
$ 470.54
[987.67)
[4,500.06)