THOMAS B. JONES, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

THOMAS B. JONES AND MARGARET A. JONES, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 44126, 44127. Filed December 30, 1957.

*J. G. Williamson, Esq.*, for the petitioners.
*John P. Higgins, Esq.*, for the respondent.

608

**OPINION.**

TURNER, *Judge:* Since much of the petitioners' opening brief is directed to the proposition that the respondent's determination was in error, in that it changed the method of accounting regularly employed by the petitioners, contrary to the provisions of section 41 of the Internal Revenue Code of 1939, it might be well to point out that the question we have here is not a question as to the proper method of accounting for and reporting income, within the purview of section 41, but is whether the petitioners received income which they did not account for and report under any method of accounting. See *Davis v. Commissioner*, 239 F. 2d 187, affirming T. C. Memo. 1955–87; *Herman J. Romer*, 28 T. C. 1228; and *Harry Gleis*, 24 T. C. 941.

By reason of the fact that the petitioners in 1943 opened a personal bank account in which, for the years 1943 through 1948, they made substantial deposits, chiefly in cash, the source of which was not shown by any of the petitioners' books or records, and by reason of the further fact that some of the deposits were found to have been receipts from the sale of soft drink concentrate and bottle caps, which were supplies of a character used in a soft-drink bottling business, the respondent determined that such portions of the deposits for the said years not verified to his satisfaction as nonincome items, such as the proceeds of loans and bond redemptions, represented unrecorded and unreported sales by the petitioners during the years herein. Similarly treated were the deposits made in 1946, 1947, and 1948 to the bank account of the trust for petitioners' children and the $9,350 in currency deposited in 1946 in the bank account of the bottling business. On the basis of that conclusion, he determined the deficiencies herein, and further that the failure to report such unrecorded sales was due to fraud with intent to evade tax. Making allowance for some further items which have been stipulated and now conceding the four additional items, one for each of the years 1944 through 1947, as shown in our Findings of Fact, it is the respondent's position, on brief, that deposits of $39,378.95 for 1943, $32,315.38 for 1944, $10,944.15 for 1945, $30,985 for 1946, $6,029.75 for 1947, and $2,991.01 for 1948, remain unidentified and unexplained, and represent unreported income.

Where, as here, a taxpayer has made numerous and comparatively large deposits in a bank account, the sources and nature of which are not recorded or accounted for in any books of account, the Commissioner's determination of income and of deficiencies in tax thereon by reference to such deposits has been approved in numerous cases. It

is, of course, true that the existence of bank deposits, although not explained or accounted for in a satisfactory manner, does not of itself show that the sums deposited were or were not income. But where the Commissioner has determined that they were, the taxpayer has the burden of showing that the determination was wrong. *Goe* v. *Commissioner*, 198 F. 2d 851, certiorari denied 344 U. S. 897; *Halle* v. *Commissioner*, 175 F. 2d 500; *Hague Estate* v. *Commissioner*, 132 F. 2d 775, certiorari denied 318 U. S. 787, affirming 45 B. T. A. 104; *Hoefle* v. *Commissioner*, 114 F. 2d 713; *Mauch* v. *Commissioner*, 113 F. 2d 555; *Herman J. Romer, supra;* and *Joseph L. Calafato*, 42 B. T. A. 881, affirmed per curiam 124 F. 2d 187.

Largely by their own testimony, the petitioners have undertaken to carry that burden. They do not dispute the amounts of the deposits, but contend that, by proof of record, they have shown that except for some small amounts of interest and a few amounts claimed to have been redeposits, in addition to those previously allowed or now conceded by the respondent, the said deposits represented cash received by them through gifts and savings over a period of 20 years or more prior to 1943, and do not represent income for any of the years herein. On the basis of that contention, they further deny that any of their returns for the said years were false and fraudulent with intent to evade tax, and such being the case, the statute of limitations on the assessment and collection of any further tax for the years 1943, 1944, and 1945 has run against the respondent.

It was the testimony of the petitioners that prior to 1943 they had kept their savings and accumulations of cash in a family safe, as had the parents of Margaret Jones during their lifetime, and that it was the cash so accumulated, not current income, which made up those portions of the deposits remaining in dispute. Admittedly, the petitioners made and maintained no record of the cash they placed in or took from the safe and they knew of no such record having been kept by William or Magdalena Beschorner. It was also admitted that the money was not counted at the time of the opening of the personal bank account in 1943. Margaret did not remember making any of the deposits in question, leaving the matter to Jones, who, according to her testimony, would remove the money from the safe for the purpose of deposit when and in the amounts suitable to him. The petitioners did testify with particularity, however, as to the receipt of specified amounts, the years or periods of receipt, and the occasions therefor. They gave further testimony relating to their living costs and spending habits, the purport of which would tend to support the conclusion that very little of the cash, once placed in the safe, was removed therefrom, until their first purchase of Government bonds and the opening of the personal bank account in 1943. In explanation of the financing of the construction of the new building at the

plant in 1939, the testimony was that they "thought about going ahead and paying for it," but decided to borrow instead, in order to establish a credit rating for the bottling business.

As related by the petitioners in their testimony, the currency placed in the safe, and which accounted for the accumulations of cash from which the deposits in question are claimed to have been made, included $2,500 received by Margaret Jones in 1919, as the proceeds of an insurance policy on the life of her uncle; $2,500 she and Jones received from her father as a wedding gift at the time of their marriage in 1928; a bequest of $100 at the death of her father in 1929, and an additional $2,500, representing the proceeds of an insurance policy on his life; "about" $75,000 received as a gift from her mother in 1930; and $12,000 to $12,500, being the proceeds from the sale by Thomas Jones of a pressing shop in Lonoke, Arkansas. It was the further testimony of Margaret that upon leaving high school she worked for about 1 year at $75 a month, and for a period of approximately 4 years, ending with her father's death, at about $125 a month, during which periods of time she had saved about two-thirds of her salary and had placed such savings in the safe. It was her further testimony that from the death of her father in 1929, until the death of her mother in 1937, she had worked almost continuously in the bottling business and had received for her services $25 a week, the import of such testimony being that this also accounted for some of the currency in the safe. As indication of a further source of cash accumulated in the safe, it was recited that from the death of William Beschorner in 1929 to the death of his widow in 1937, Thomas Jones had managed the bottling business, for 50 per cent of the profits, and that his savings therefrom were also kept in the safe.

In explanation of her testimony that she had saved approximately two-thirds of her salary received prior to her father's death, Margaret testified that she lived with her parents and as a consequence had no living expenses, and further, that she bought little, if any, of her own clothes. As a part of their testimony that they had substantial savings from the compensation received by them from the bottling business from the date of William Beschorner's death to that of Magdalena Beschorner, both petitioners testified that in addition to the wedding present of $2,500 in cash, William Beschorner had bought all of the furniture for their apartment and that after William Beschorner's death Magdalena Beschorner had not only paid most of the household expenses but had made most of the clothes of Margaret and her children.

Also the argument is made on brief that there is basis of record for concluding that the petitioners could also have had some further savings of cash during the years 1939 to 1942, inclusive, and in sup-

port thereof reference is made to the taxable net income as reported by them on their income tax returns for the said years, plus the depreciation deductions taken for those years, amounting in all to $49,025.68.

Jones also testified that a further sum of $10,950 represented redeposits of three items in the personal bank account, which have not been conceded or allowed as such by the respondent.

While at no point in their testimony were the petitioners willing to state or admit to any definite amount as being the sum of money in the safe at the time the withdrawals began, they did, as noted above, testify with definiteness as to the sources of such money and, except with respect to savings from their personal earnings and the slight qualification as to the amount claimed to have been received from Magdalena Beschorner in 1930, they were also specific as to original amounts. They did admit to the taking or receiving of money from the safe, from time to time, but the import or implication was that the money so taken was in small amounts and did not materially reduce the amount of money in the safe. On that basis, it is claimed that the sources of all their bank deposits have been accounted for, and except for the small amounts of interest, claimed as having been inadvertently omitted from their returns, none of the deposits in question represented income for any of the years herein.

We are satisfied from the record that the petitioners, in the years prior to 1943, did accumulate and keep cash in the family safe, and beginning in 1943 they did make deposits of such cash in their newly opened bank account. But the evidence does not, in our opinion, permit or justify an affirmative finding that the money so accumulated in the safe was sufficient in amount to cover and account for all of the deposits in question herein. In short, it is our conclusion that the petitioners have failed to bear their burden of showing that the deposits did not in some substantial part represent income and that the respondent's determination that such deposits did represent income was wrong.

The largest single item of cash cited and relied on by the petitioners as showing that the deposits in question were from the cash accumulated prior to the taxable years, is the "about" $75,000 claimed to have been received by Margaret Jones as a gift from Magdalena Beschorner in 1930, the purported source of most, if not all, of such sum being cash accumulated by William in his lifetime and left to Magdalena at his death. It is not possible to determine how much cash Margaret received, or may have received, by way of gift from her mother in 1930, or at other dates. But whatever the amount, the record before us does not permit a finding that any sum even approaching $75,000 was received by Margaret from her mother at the time of the purported

gift in 1930. As a matter of fact, Margaret disclaimed any counting of the money or any direct or personal knowledge of the amount when the claimed gift was made, but testified only that her mother had told her that the amount was about $75,000. In contrast, William Beschorner's net estate at April 23, 1929, as reported for Arkansas inheritance tax purposes, was only $6,970, and the only reported assets were $4,000 in cash, $2,000, representing the net value of the bottling business, and $1,500, representing the value of his interest in four lots. With respect to the inheritance tax return, the argument of the petitioners, on brief, is that they were not responsible for and never had anything to do with the preparation of the inheritance tax return and that the uncontradicted evidence of record here is that the return was erroneous.

Whatever the truth may be as to the correctness or incorrectness of the inheritance tax return, there is other evidence strongly tending to contradict any claim that Magdalena Beschorner had received "about" $75,000 on the death of William Beschorner, and had such sum on hand in 1930. On June 6, 1929, less than 2 months after William's death, Magdalena executed a will, which was the will probated after her death in 1937. Under the terms of the will, Margaret was to receive the bottling business and a two-thirds interest in the real estate. Elizabeth was to receive one-third of the real estate and all of Magdalena's moneys, stocks, and bonds. Aside from any significance that might attach to the fact that Margaret was Magdalena's natural daughter, whereas Elizabeth was an adopted daughter, the petitioners in the course of their testimony painted a rather vivid picture of strained relations between Magdalena and Elizabeth prior to and after the date on which the will was executed. In the circumstances, it would not in our opinion be realistic or reasonable to conclude that Magdalena on June 6, 1929, would have executed a will under which "about" $75,000 in cash would go to Elizabeth, plus a one-third interest in the duplex residence and other real estate, while at the same time making provision for Margaret only to the extent of the bottling business, having a reported net value as of a date less than 2 months preceding of only $2,000 and which even at Magdalena's death in 1937 was estimated by Margaret at $10,000, plus the two-thirds interest in the duplex and other real estate.

Assuming, however, that Margaret did receive "about" $75,000 as a gift from her mother in 1930, representations made by petitioners to revenue agents prior to the trial herein indicate that only about one-half of such a gift could, in reason, have been available in the taxable years as a source of the bank deposits in controversy. According to the evidence, the petitioners' representative, in early 1950 and in the presence of petitioners, delivered to the revenue agents a statement

designed to show the amount of cash on hand at January 1, 1940, not shown by the books of the bottling business or any other records kept by petitioners. Seven items, amounting in the aggregate to $71,600, were listed, of which six, on the basis of their designations, could not have had their origin in gifts from Magdalena Beschorner, leaving only an item of $36,100, described as "[m]oney received from time to time," which could have represented the claimed gift. It would thus appear that if there was a gift in 1930 as now claimed, only about one-half thereof was still in possession of petitioners at January 1, 1940.

Another item claimed as one source of the said deposits was $12,000 to $12,500 represented as being the proceeds of the sale of a cleaning and pressing shop which had been owned by Thomas Jones when a high school boy in Lonoke, which amount, it is claimed, was placed in the Beschorner family safe after he and Margaret were married in 1928. The account of the purchase of the shop for $1,500 or $2,000, the operation of the business for approximately 2 years, and its sale to his brother for $12,500, when business in Lonoke was "fair" but "not too good," made an intriguing story as related by Jones in the course of his testimony. But after listening with attention to the details of the story as it was being told and considering all of its facets thereafter, suffice it to say, for the purposes here, that if Jones did have $12,000 to $12,500 in savings and profits at the date of his marriage, we are satisfied and convinced that at least in major part it did not represent the proceeds from the sale of the said cleaning and pressing business. In short, we do not know what amount of premarital savings and profits, if any, Jones may have had in the family safe.

We are thus of the view that the petitioners have failed to prove that the deposits in controversy did not in substantial part represent current income not reported in their returns. See and compare *Hague Estate* v. *Commissioner, supra,* and the other cases heretofore cited. The respondent does not deny, however, that the statute of limitations has run for the years 1943, 1944, and 1945, unless the returns for those years were false and fraudulent with intent to evade tax, and the burden to show that such was the case was on him, not the petitioners. Sec. 1112, I. R. C. 1939; sec. 7454 (a), I. R. C. 1954. He has not, in our opinion, carried that burden.

According to the notices of deficiency, it was the respondent's determination that the deposits in controversy represented unreported sales. The record shows that the revenue agents, in making their investigation, had found that certain checks included in the said deposits were such as to indicate that they could have represented bottling business receipts, and, finding no explanation satisfactory

to themselves of the funds making up the deposits, they concluded that bottling business profits were being deposited in the personal bank account, thereby bypassing the bottling business books and the income tax returns filed. Contrary to that conclusion, however, the proof of record is quite convincing that, aside from some adjustments, not in issue and which have no bearing on the question of fraud, the income from the bottling business was fairly and fully accounted for and reported.

Some of the deposits in controversy did include proceeds from the sale of soft drink syrup and bottle caps, both of which were items related to the bottling business, but the respondent now concedes that no profits were realized on such sales and that the deposits of the sales checks therefor in the personal bank account did not reflect the receipt of unreported income. Where the syrup paid for by checks drawn on the personal bank account was used in the bottling business, such syrup was accounted for on the bottling business books at cost, and the respondent now concedes that there was no distortion or underreporting of income with respect thereto. In short, the respondent's proof is that the petitioners, during the years 1943, 1944, and 1945, did have in their possession and did deposit in their personal bank account amounts of money which if they were current income would provide some support for his determination that the petitioners in their returns for the said years fraudulently understated their income and that the returns were false and fraudulent with intent to evade tax. As noted above, however, the existence of bank deposits, although not explained or accounted for in a satisfactory manner, does not of itself show that the sums deposited were or were not income. And just as the petitioners failed to show that the deposits in controversy did not in some substantial part represent income, the respondent has similarly failed to prove that the amounts in question were income, and the mere showing on his part that there was a failure to report as income items which insofar as shown by the evidence could in some part have been either income or nonincome items does not establish that, by reason of the omission of such items, the returns were false and fraudulent with intent to evade tax. It is true, and the petitioners now concede, that $210.30 in 1944 and $480.05 in 1945, representing interest on Government bonds, was deposited in the personal bank account and was not reported as income in their returns for those years. The record being as it is, however, we are unable to say that the omission of those items of income was not inadvertent, as the petitioners contend. By reason of the respondent's failure to bear his burden of proof, the statute of limitations issue as to the years 1943, 1944, and 1945 is decided for the petitioners.

For the years 1946 and 1947, there is no question of the running of the statute of limitations, and the issues are whether or to what extent the petitioners have proven that the respondent's determination of deficiencies was in error, and whether the respondent has borne his burden of proving that any of the deficiencies for those years was due in part to fraud with intent to evade tax. Whatever the amount of the unreported cash the petitioners did have on hand at January 1, 1943, the proof, for the reasons discussed above, does not justify the conclusion that any part thereof did account for the deposits in 1946 and 1947 determined by the respondent to have represented income. Subject to the proper allowances for net operating loss carrybacks from 1948 and 1949, the respondent's determination of deficiencies for 1946 and 1947 is sustained, for failure of proof.

Similarly, for reasons heretofore stated, we conclude and hold that the respondent has failed to show that any part of the deficiency for either 1946 or 1947 was due to fraud with intent to evade tax. For such failure of proof on his part, his determination of additions to tax for such years for fraud is rejected. *Sidney Cohen*, 27 T. C. 221.

We do not understand that the amount of the net operating loss carryback from 1949 is in dispute. For 1948, as indicated by our findings of fact, the respondent did make a comparatively small downward adjustment in his determination of the net operating loss claimed for that year. For the reasons stated in sustaining the respondent's determination of deficiencies for 1946 and 1947, the respondent is similarly sustained in his determination of the amount of the net operating loss for 1948.

*Decisions will be entered under Rule 50.*