FRITZ S. and NOREEN P. SINGER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Singer v. Commissioner
Docket No. 6358-76.
United States Tax Court
T.C. Memo 1979-383; 1979 Tax Ct. Memo LEXIS 138; 39 T.C.M. (CCH) 181; T.C.M. (RIA) 79383; September 19, 1979, Filed Phillip K. Fife, for the petitioners. Karl D. Zufelt, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION *138 FEATHERSTON, Judge: Respondent determined the following deficiencies in petitioners' Federal income tax and additions to tax under sections 6651(a)[1]/ and 6653(a): Additions to Tax
Year
Deficiency
Sec. 6651(a)
Sec. 6653(a)
1970
$154,421
$38,605
$8,313
1971
24,872
6,218
1,244
The issues for decision are: 1. Whether petitioners understated their gross income on their 1970 and 1971 Federal income *139 tax returns. 2. Whether petitioners' failure to timely file Federal income tax returns for 1970 and 1971 was due to their willful neglect and not due to reasonable cause within the meaning of section 6651(a). 3. Whether any part of the underpayments (if such underpayments exist) of taxes for 1970 and 1971 was due to "negligence or intentional disregard of rules and regulations" within the meaning of section 6653(a). FINDINGS OF FACT 1. General
Petitioners Fritz S. and Noreen P. Singer (hereinafter petitioners), husband and wife, were legal residents of Seal Beach, California, when they filed their petition. Petitioners filed joint Federal income tax returns for 1970 and 1971 on March 13, 1974. The returns were prepared by Richard A. Christensen (Christensen), a certified public accountant. From 1954 through August 1970, petitioner Fritz S. Singer (Singer) operated an insurance agency known as the Pilot Insurance Service (Pilot). In this business, Singer would usually receive premiums from his insurance customers (i.e., gross premiums), deposit the gross premiums in one of his bank accounts, and then pay the insurance companies the net premiums due after deducting *140 his commission. On occasion Singer paid the insurance companies prior to collecting the premiums from his customers. Singer sold this business in August 1970, but retained the right to renewal premiums on certain outstanding policies. 2. Consolidated Cargo Services, Inc. (CCS)
In 1969, Singer and a friend, Carl Gross (Gross), formed a corporation called Consolidated Cargo Services, Inc. (CCS). The principal activity of CCS was operating a container freight business. Singer and Gross each owned 50 percent of CCS's stock and were its officers and employees. Gross was responsible for CCS's day-to-day operations, and Singer was in charge of sales and marketing. Singer devoted approximately 25 to 35 percent of his time to CCS's business. At the time of CCS's incorporation, Singer and Gross each contributed $1,500 to its capital. CCS also obtained a line of credit, personally guaranteed by Singer and Gross, from the Bank of America, Los Angeles, California (the Bank). CCS had few tangible assets, and the Bank relied upon the guarantees of Singer and Gross and on the company's accounts receivable for collateral. Most of CCS's accounts receivable and most of its revenue *141 arose from a contract with Japan Lines. In early 1971, Japan Lines terminated its contract with CCS, and this loss of business, coupled with a stevedore strike, was the major factor leading to the dissolution of CCS in late March 1971. Throughout its existence, CCS lost money from its operations. In order to keep CCS operating, Singer, either in his own name or through Pilot, and Gross advanced money to CCS to cover current operating expenses. During 1970 and 1971, Gross advanced approximately $55,000 to CCS. In 1970, Singer advanced $10,500 through Pilot and personally paid $17,500 to the Bank to reduce CCS's indebtedness. Singer also advanced additional sums directly to CCS in both 1970 and 1971. CCS gave no notes commemorating the advances and paid Singer and Gross no interest, but periodically made partial repayments of the advances. 3. Oceanographic Geophysical Corporation (OGC) and Oceantech, Panama, S.A. (Oceantech)
Oceanographic Geophysical Corporation (OGC) was a corporation, wholly owned by Robert Pollock (Pollock), which was formed primarily to recover communication cables abandoned by the United States Navy off the coast of Panama. A related corporation, *142 Oceantech, Panama, S.A. (Oceantech) was formed to handle OGC's business in Panama. In early 1970, Pollock approached Singer and discussed plans to retrieve the cable and a proposal that CCS handle the disposition of the metal to be extracted from the recovered cable. In addition, Singer was to be the insurance agent through whom OGC would insure the salvage vessels need for the recovery operation. At the time of the initial meeting, Pollock had obtained neither the required contract from the Panamanian government to recover the cable nor financing for the operation. Shortly thereafter, Singer introduced Pollock to Edward Snead (Snead), the Bank's representative which also handled petitioner's and CCS's accounts. Pending Pollock's and OGC's loan application with the Bank, Singer advanced money on open account to Pollock and authorized Pollock to use his credit cards to cover expenses expected to be incurred in negotiating the contract with the Panamanian government. In those ways Pollock borrowed from Singer approximately $13,000. 4. Petitioners' Income Tax Returns for 1970 and 1971
Petitioners reported on their returns for 1970 and 1971 the following items of income: *143 1970
1971
"Pilot" gross receipts
$139,580 $0
Sale of "Pilot" [1]/
11,200
0
Covenant not to compete [1]/
58,800
0
Rental income
1,095
0
Interest
34
69
Dividends
98
197
Wages from "Pilot"
7,800
1,950
$218,607
$2,216
During 1970 and 1971, petitioners incurred the following expenses which they did not claim on their returns and which are deductible: 1970
1971
Insurance premium expense
$35,162.00
$ 7,978.14
Interest expense
818.26
5,925.22
Premium returns
3,211.88
0
Taxes
0
2,327.37
Medical
0
150.00
Charitable
0
100.00
$39,192.14
$16,480.73
The $7,978.14 premium expense item for 1971 *144 is attributable to the fact that petitioners claimed on their 1971 return insurance premium expense of only $30,028 whereas Singer actually incurred during that year expenses of $38,006.14, as follows: Payee
Amount
American National General Agencies
$28,500.00
American National General Agencies
8,511.00
AFCO
582.14
Houston General Insurance Group
229.00
All American Life and Casualty
118.45
Hartford Insurance Group
65.55
$38,006.14
5. Respondent's Determination
Petitioners' records and those of CCS were destroyed by vandalism in December 1972, and respondent reconstructed petitioners' income by use of a form of the bank deposits method. In making this reconstruction, respondent added together all deposits made by petitioners to their bank accounts and subtracted from the total the deposits identified as not representing income and the deposits representing income already reported. The notice of deficiency determined that petitioners made bank deposits of $531,388.76 in 1970 and $102,763.01 in 1971. The notice adjusted these deposits for various items and determined that petitioners' income should be increased by $281,839 for 1970 and $100,744 *145 for 1971. In the light of subsequent investigations and the evidence presented at the trial, respondent has conceded that the notice of deficiency overstated petitioners' income and contends on brief that petitioner failed to report income in the amounts of $46,418 in 1970 and $80,559.46 in 1971, computed as follows: 1970
1971
Bank deposits
$536,962.86
$150,404.71
Less: Transfers
134,967.27
5,829.25
Loan proceeds
64,946.40
61,800.00
Boat sale proceeds
23,287.32
0
Sale of residence
44,705.87
0
Additional transfers
4,031.00
0
Gross income
$265,025.00
$ 82,775.46
Less income reported on
return: Gross receipts
$139,580.00 $0
Covenant not to compete
58,800.00
0
Sale of Pilot
11,200.00
0
Rental income
1,095.00
0
Wages
7,800.00
1,950.00
Interest
34.00
69.00
Dividends
98.00
197.00
Reported income
$218,607.00 $ 2,216.00
Unreported gross income
$ 46,418.00
$ 80,559.46
6. Repayments of Loans by OGC and Oceantech
Of the approximately $13,000 Singer advanced to Pollock to enable Pollock to initiate the cable recovery business, OGC or Oceantech repaid Singer $5,000 in October 1970 and another $5,000 in February *146 1971. Singer deposited the October 1970 repayment in his Pilot Insurance Service Trust Account (No. X6165) at the Bank. He deposited $1,300 of the February 1971 repayment in his account at Security Pacific National Bank (No. XX6-346). The other $3,700 is not documented. 7. Repayments of Funds Advanced to CCS
CCS from time to time repaid Singer for the funds he had advanced to it. On November 11, 1970, Singer deposited in account No. X6165 a repayment from CCS in the amount of $1,031. On December 9, 1970, and December 29, 1970, he deposited in account No. X6118 repayments from CCS in the sums of $2,000 and $1,000, respectively. In total, Singer received in 1970 loan repayments in the amount of $27,500. In March 1971, Japan Lines paid CCS $63,133 in partial payment of its account. On March 26, 1971, CCS repaid Singer $35,000 of his advances out of the proceeds of a loan of $75,000 which CCS received from OGC. That repayment, the only one documented in 1971, was deposited in account No. X6118 at the Bank. On March 31, 1971, the Bank debited that account for $20,312.02 to pay an outstanding loan owed to the Bank by Singer. On March 31, 1971, a check in the amount *147 of $28,500, made payable to the American National General Agencies (American National) for insurance premiums covering the Pecos and the Cimarron, the two ships owned by Oceantech which were to be used in the salvage operations, cleared through that account. On June 3, 1971, Singer paid American National $8,511 for insurance on the two ships, and on June 4, 1971, Singer deposited in the account a check from Oceantech in the amount of $10,403.25. The difference between the $8,511 and the $10,403.25 represented commission income to Singer. ULTIMATE FINDINGS OF FACT 1.Petitioners failed to report income in the amounts of $13,918 and $40,559.46 in 1970 and 1971, respectively. 2. Petitioners are liable for additions to tax pursuant to section 6651(a) for 1970 and 1971. 3. Petitioners are not liable for additions to tax under section 6653(a) for 1970 and 1971. OPINION In determining the deficiencies here in dispute, respondent employed a variation of the bank deposits method of income reconstruction whereby he started with gross deposits made to petitioners' bank accounts. He then subtracted both identified nonincome items included in the deposits and reported income, *148 and treated the remaining unexplained deposits as taxable income. Such a method has long been sanctioned by this Court. Estate of Mason v. Commissioner,64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977); Johnes v. Commissioner,29 T.C. 601, 613-614 (1957). Since petitioners failed to present the examining internal revenue agents with records of their deposits, respondent was authorized to use such an indirect method of income reconstruction in redetermining petitioners' income. Under that method, though not conclusive, bank deposits are prima facie evidence of income. Price v. United States,335 F.2d 671, 677 (5th Cir. 1964). To show that their bank deposits were not currently taxable income, petitioners have the burden of proving that the deposits were derived from some nontaxable source. Estate of Mason v. Commissioner,supra at 657; Jones v. Commissioner,supra at 614. Petitioners contend that respondent's determination was in error in that it failed to recognize *149 the nontaxable nature of (a) the $5,000 payments Singer received in 1970 and 1971 from OGC or Oceantech, (b) deposits totaling approximately $40,000 in 1970 and $59,942.70 (including a single deposit in the amount of $35,000 in 1971) which petitioners contend were repayments of loans Singer made to CCS during 1970 and 1971, and (c) interaccount transfers in the amount of $15,616.76 [2]/ purportedly made in 1971. 1. Payments from OGC and Oceantech
Singer testified that, in early 1970, he entered into an informal agreement with Pollock whereby he, individually and through CCS, agreed to assist Pollock in disposing of metals to be extracted from communication cables abandoned by the United States Navy off the coast of Panama and to insure the salvage vessels to be used in the recovery operations. At the time of their initial meeting, Pollock had obtained neither the necessary contract from the Panamanian government to recover the cable nor the financing needed for the operation. Singer testified that, in order to help Pollock cover his expenses during the start-up period, he loaned Pollock money on open account and let Pollock *150 use his credit cards and in these ways advanced approximately $13,000 to Pollock. In repayment of those advances petitioners maintain that OGC or Oceantech, corporations controlled by Pollock, paid Singer or Pilot $5,000 in October 1970 and another $5,000 in February 1971. Respondent questions petitioners' contentions that Singer loaned money directly to Pollock or let Pollock use his credit cards. Rather, respondent argues, the payments which Singer received from OGC or Oceantech represent compensation for services rendered by Singer to OGC. We disagree. We think petitioners have shown that these sums were nontaxable repayments of loans. We are convinced, on this purely factual issue, that Singer's testimony was credible. It is corroborated at least partially by the testimony of Snead, the officer of the Bank who handled various loan transactions involving CCS, OGC, Oceantech, and Singer. It is not uncommon for an individual or corporation in Pollock's or OGC's position in starting a new venture to be short of capital. Nor is it unusual for one who is to be involved in the business venture, such as Singer, to loan money to the new venture. OGC was short of funds during *151 early 1970. It was not until September or October 1970 that OGC received its initial loan in the amount of $15,000 from the Bank. Immediately after receiving that loan, OGC repaid Pilot $5,000. In March 1971, OGC loaned CCS $75,000. Respondent emphasizes the facts that petitioners did not present any documentary evidence to substantiate the loans and that Pollock was not called to testify. We do not think either point is factal to petitioners' case when it is viewed in the light of Snead's and Singer's credible testimony. We recognize that Pollock's testimony would have been valuable. However, he was as readily available as a witness to respondent as to petitioners. Cf. Kean v. Commissioner,469 F.2d 1183, 1187-1188 (9th Cir. 1972). This is not a situation where an inference that Pollock's testimony would have been unfavorable can be drawn from his failure to testify. Cf. O'Dwyer v. Commissioner,226 F.2d 575, 584 (4th Cir. 1959), affg. 28 T.C. 698 (1957), cert. denied 361 U.S. 862 (1959); Stoumen v. Commissioner,208 F.2d 903, 907 (3rd Cir. 1953), affg. a Memorandum Opinion of this Court. *152 Except for a short period of time in 1970 and early 1971, Pollock and Singer were not in such a close business or social relationship as to permit the inference argued by respondent. 2. Payments from CCS
In 1969, Singer and Gross incorporated CCS, the company whose principal activity was operating the container freight business, with an initial capitalization of only $3,000. Apparently they anticipated that this small capitalization, coupled with the line of credit which the company had with the Bank, would be sufficient to permit CCS to begin and maintain operations. This was not to be. CCS lost money from its operations and, after losing the Japan Lines business and a costly stevedore strike, was finally dissolved in March 1971.
In addition to its poor overall financial condition, CCS was plagued throughout its existence by continued cash flow problems. On many occasions, when funds were unavailable from the bank, Singer, either individually or through Pilot, and Gross, to a lesser extent, advanced money on open account to CCS and paid CCS's debts directly. Singer made his advances to cover current operating expenses. He expected, and did receive to a limited extent, *153 repayment of the advances shortly after they were made. Unfortunately, petitioners do not have records of most of the advances or repayments, the records having been destroyed by vandals. Petitioners, however, were able to document that in 1970 Singer advanced through Pilot $10,500 and personally paid $12,500 to the bank to reduce CCS's indebtedness. Through testimony, petitioners also convinced us that Singer advanced an additional $5,000 to CCS in 1970. With regard to the repayments, petitioners have documented only the three payments from CCS totaling $4,031 received in November and December 1970 and a $35,000 payment from CCS received on March 26, 1971. Petitioners contend that, during 1970 and 1971, they received payments from CCS, including those documented, totaling approximatey $40,000 and $59,942.70, respectively, and that those receipts represent nontaxable loan repayments. We agree with petitioners that CCS was repaying its debts during 1970. However, in view of petitioners' inability to document the actual amount of the repayments received in 1970, we are placed in a position of having to deny any further claims or, in the light of all the evidence, make an estimate *154 of the repayments.We think the cause of justice requires us to follow the latter course. We estimate Singer received from CCS and deposited in his bank account $27,500 in loan repayments during that year. Cohan v. Commissioner,39 F.2d 540, 543-544 (2d Cir. 1930). With regard to 1970, respondent argues that premiums earned from the substantial insurance business which Singer operated during that year was the likely source of the unexplained bank deposits. Respondent's argument is supported partially by the fact that petitioners failed to deduct on their 1970 income tax return $35,162 of insurance premium expenses. Such an omission of allowable deductions, when they relate to an income-producing activity such as Singer's insurance business, tends to support a determination that the 1970 return also omitted income. Clark v. United States,211 F.2d 100, 103 (8th Cir. 1954), cert. denied 348 U.S. 911 (1955). However, we do not think the omission and conclusion respondent asks us to draw therefrom explain entirely the unreported deposits. Rather, the possibility that Singer had unreported income from his insurance business was only *155 one factor which we used in estimating the amount of the loan repayments made by CCS in 1970. Included in the deposits treated as taxable income in respondent's income reconstruction for 1971, was a credit of $35,000 to petitioners' Bank account No. X6118. Petitioner contens that this $35,000 was a repayment of moneys advanced to CCS by Singer in late 1970 or early 1971. Respondent contends that the $35,000 represented taxable business income received by Singer for insuring the Pecos and the Cimarron, the two ships owned by Oceantech. We do not think the evidence supports respondent's argument. We have concluded petitioners' position is more reasonable. Shortly before March 26, 1971, OGC advanced $75,000 to CCS. On March 26, 1971, CCS transferred $35,000 to petitioners' Bank account No. X6118. On March 31, 1971, a check in the amount of $28,500 payable to American National for insurance coverage for Pecos and Cimarron cleared through that account. Respondent argues that the $35,000 represents gross premiums received by petitioner for insuring the ships and that the $28,500 represents the net premiums due the insurance company and are deductible expenses to Singer. Although *156 we think the $28,500 is deductible, it is our opinion that the $35,000 was not gross premiums from OGC. Respondent's argument as to the $35,000 is based on the faulty premise that CCS was merely an agent for OGC in receiving and transferring the funds. We agree with petitioners that OGC loaned CCS the $75,000, and that CCS was not merely a conduit for transmitting the $35,000 to Singer. On March 9, 1973, OGC filed with the Superior Court of the State of California for the County of Los Angeles a complaint against, interalia, Gross, Singer, and CCS. In that complaint OGC alleged that, on or about March 15, 1971, it loaned $75,000 to the defendants named in the complaint and that none of that amount had been paid. On May 23, 1973, Gross and Singer filed an answer in which they denied liability for the loans in their individual capacities. This complaint was not admitted to establish the truthfulness of the allegations but to show that OGC had taken that position. In the light of all the evidence, it is our opinion that OGC and CCS intended the $75,000 to be a loan to CCS. As evidence that the $35,000 represented gross premiums, respondent points to the fact that *157 Singer stated that had he not received the $35,000 from CCS that he would not have been able to pay the $28,500 premiums. We do not find this statement particularly harmful to petitioners' argument. Rather, it appears that Singer was simply stating that had he not received the money from CCS it would have been financially impossible for him to pay the premium and not that he considered the $35,000 a payment of gross premiums. As further evidence, respondent draws our attention to the fact that on June 3, 1971, Singer paid $8,511 to American National for insurance on the two ships and on June 4, 1971, Singer deposited a check from Oceantech in the amount of $10,403.25. The difference between the two amounts of $1,892.25 represented commission income to Singer. Although the deposit was made one day after the premium payment, Singer received the payment from Oceantech prior to paying American National. Respondent asserts that the same procedure of prior payment of gross premiums was followed in connection with the $35,000. Singer testified, however, that on occasion he paid the insurance companies prior to receiving premiums from his insurance clients and that the initial transaction *158 involving Pecos and Cimarron was handled in that way. Respondent did not establish he source of the remaining deposits of $38,667.21, the unexplained 1971 deposits in excess of the $5,000 received from Pollock or OGC, the $35,000 received from CCS, and the $1,892.25 of commission income earned in June 1971. Nonetheless, we think those amounts are taxable. The deposits themselves are evidence of income, and it is incumbent upon petitioners to prove they are nontaxable. Goe v. Commissioner,198 F.2d 851, 852 (3rd Cir. 1952), affg. a Memorandum Opinion of this Court, cert. denied 344 U.S. 897 (1952); Jones v. Commissioner,29 T.C. 601, 614 (1957). Petitioners assert that $23,050.45 of the unexplained 1971 deposits came from CCS as loan repayments. Unfortunately, from the evidence petitioners presented we are unable to determine what part, if any, of that amount was paid by CCS to Singer and we are therefore forced to disagree with their assertion. 3. Interaccount Transfer
Petitioners assert the remainder of the unexplained 1971 deposits, in the amount of $15,616.76, are interbank transfers. [3]/ We disagree. *159 During 1971, petitioners deposited $22,326.76 into their account at Security Pacific National Bank, No. XX6-346. Of that amount, $1,300 represented part of the $5,000 received from Pollock or Oceantech during 1971 and $5,420 represented an interbank transfer from the Bank, account No. X6118. Petitioners argue that the remainder of the deposits, $15,616.76, came from he "savings" of $25,000 deposited in account No. X6118 in September 1970, after the sale of their residence. As support for their argument that the deposits to account No. XX6-346 arose from a transfer from their "savings" account, petitioners contend that it would be logical to conclude that Singer deposited savings in the account at Security National which Noreen Singer used to pay household bills. We are not convinced that petitioners maintained such a purity of function for each account. In light of Singer's proclivity of transferring funds amongst his many bank accounts, we do not find it illogical at all, as respondent asserts, that he would deposit business income directly into a household account. 4. Section 6651(a) Addition to Tax
Petitioners filed their Federal income tax returns for 1970 and *160 1971 on March 13, 1974, which was after the filing deadline for both years. They had not requested extensions to file their returns. In his notice of deficiency, respondent determined that petitioners were liable for an addition to tax pursuant to section 6651(a) upon the ground that their returns were not filed within the prescribed time period and that petitioners had not shown that they delay was due to reasonable cause. We agree with respondent. Under section 6651(a)(1), [4]/ the question is whether petitioners' failure each year to file timely returns was due to reasonable cause. Petitioners maintain that "reasonable cause" is shown by their belief that they did not owe taxes for 1970 and 1971, their reliance on their accountant "to timely prepare their returns if they in fact owed any tax," and the fact that their records were destroyed by vandals in December 1972. These arguments do not show reasonable cause within the meaning of section 6651(a). Mauldin v. Commissioner,60 T.C. 749, 762 (1973). *161 Reliance on the advice of a qualified attorney or certified public accountant is reasonable cause only if the advisor is fully informed. Coldwater Seafood Corp. v. Commissioner,69 T.C. 966, 974 (1978); Latham Park Manor, Inc. v. Commissioner,69 T.C. 199, 219 (1977). Here petitioners have failed to present evidence that they consulted Christensen, the certified public accountant who ultimately prepared their returns in 1974, and relied on his advice prior to the filing deadlines for the returns. Also petitioners' reliance on the fact that their records were destroyed by vandals is clearly misplaced. That event occurred in December 1972 well beyond the filing deadlines for both the 1970 and 1971 returns.
5. Section 6653(a) Addition to Tax
In his notice of deficiency respondent determined section 6653(a) additions to tax against petitioners of $8,313 and $1,244 for 1970 and 1971, respectively. That section provides that if any part of an underpayment is *162 due to negligence or intentional disregard of the rules and regulations (but without intent to defraud), there will be added to the tax an amount equal to 5 percent of the underpayment. Respondent argued in his brief the fact that petitioners failed to report large amounts of their income in both 197/ and 1971 is evidence that petitioners disregarded the rules and regulations and are therefore liable for additions to tax in both years. We disagree. Petitioners' returns were prepared by Christensen, a certified public accountant, and filed on March 13, 1974. In December 1972, vandals destroyed many of petitioners', Pilot's, and CCS's records. Christensen was placed therefore in the uneviable position of having to prepare petitioners' returns from incomplete records. Although that difficulty does not excuse the omission of income, it is a reasonable explanation of how it happened. There is no evidence that the problems of preparing the returns were heightened by petitioners' withholding information from Christensen. Petitioners were not negligent i/n relying on Christensen's expertise. Industrial Valley Bank & Trust Co. v. Commissioner,66 T.C. 272, 283 (1976). *163 This conclusion is supported by the fact that, at least with regard to 1971, most of the omitted income arose from payments from CCS which, as discussed at length above, was dependent upon determination of the difficult question of whether Singer's advances were loans or risk capital.Reliance on the advice of an expert with regard to such a complex legal issue on which there can be an honest difference of opinion is not negligence. Cf. Bunnel v. Commissioner,50 T.C. 837, 843 (1968); Marcello v. Commissioner,43 T.C. 168, 182 (1964), affd. in part and remd. in part 380 F.2d 499 (5th Cir. 1967). On June 4, 1971, Singer received from Oceantech a check in the amount of $10,403.25 of which $8,511 was paid for insurance for the two ships, Cimarron and Pecos, used in the recovery operation. The remainder, $1,892.25, was a commission to Singer. As evidence of negligence in 1971, respondent points to the fact that petitiojners failed to report that commission on their returns. The information on this transaction was available to Christensen *164 and he clearly should have reported the income on the return.However, as explained above, petitioners were justified in relying on his advice. The fact that this income was omitted does not show negligence on their part. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. /↩ All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.
1. /↩ For the first time on brief, petitioners argued that the allocation of $70,000 in total proceeds realized from the sale of Pilot ($11,200 for the sale of Pilot plus $58,800 for the covenant not to compete) used on their return was incorrect and that the proper allocation would have resulted in a lower amount being allocated to "Covenant not to compete." That issue was not raised in the pleadings or in petitioner's counsel's opening statement at the trial. It is not properly before the Court.
2. /↩ See page 25 of this opinion.
3. /↩ In brief petitioners assert that $16,916.76 was unexplained. However, we have found that petitioners deposited $1,300 of their loan repayment from Pollock in account No. XX6-346. In brief petitioners assert that $16,916.76 was unexplained. However, we have found that petitioners deposited $1,300 of their loan repayment from Pollock in account No. XX6-346.
4. /SEC. 665u. FAILURE TO FILE TAX RETURN OR TO PAY TAX. (a) Addition to the Tax.--In case of failure-- (1) to file any return required under authority of subchapter A of chapter 61 (other than part III thereof), subchapter A of chapter 51 (relating to distilled spirits, wines, and beer), or of subchapter A of chapter 52 (relating to tobacco, cigars, cigarettes, and cigarette papers and tubes), or of subchapter A of chapter 53 (relating to machine guns and certain other firearms), on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate;↩