BENSON APOTHAKER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Apothaker v. Commissioner
Docket No. 10459-76.
United States Tax Court
T.C. Memo 1985-445; 1985 Tax Ct. Memo LEXIS 183; 50 T.C.M. (CCH) 898; T.C.M. (RIA) 85445; August 26, 1985. J. Earl Epstein and Louis W. Fryman, for the petitioner. Russell K. Stewart, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent has determined a deficiency in petitioner's 1969 Federal income tax in the amount of $91,290.50 and a section 6653(b)[1] addition in the amount of $45,645.25. This fraud case involves the proceeds of various stolen securities that petitioner sold for one Reuben Suny. Respondent contends that petitioner knew the securities were stolen and that petitioner kept part of the sales proceeds, which he failed to report in income. Respondent also contends that petitioner failed to report *184 in income other amounts paid to him by Suny. Unless respondent proves that petitioner's tax return was false or fraudulent with intent to evade tax, the statute of limitations precludes his assessment and collection of any deficiencies. Secs. 6501(a), 6501(c)(1). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner resided in Jenkintown, Pennsylvania, at the time he filed his petition in this case. Petitioner timely filed an income tax return (Form 1040) for 1969 as a joint return for himself and his wife, Leah. [2]
Petitioner operated an insurance agency known as H. Apothaker's Son, Inc. (the insurance *185 corporation). Petitioner formed the insurance corporation in 1958 and controlled it through the year in issue. Also in 1958, petitioner formed First Montgomery Corp. (First Montgomery) to finance insurance premiums. First Montgomery was largely inactive during the year in issue, although it did file a corporate income tax return (Form 1120) for its fiscal year ending August 31, 1970. During 1969, petitioner and his wife, Leah, operated a partnership to invest in real estate and securities. This partnership, formed sometime before 1969, was known as H. Apothaker's Son (the partnership). During 1969, petitioner and his various businesses had the following bank checking accounts: Name
Bank
Acct. No.
Petitioner and Leah Apothaker
Philadelphia National Bank
238-4351
(PNB)
Petitioner or Leah Apothaker
Cheltenham National Bank
15-02-719
(Cheltenham)
Petitioner and Leah Apothaker
Girard Trust Bank (Girard)
3-974-508
Insurance Corporation
Continental Bank
12-1-357-8
(Continental)
Partnership
Continental
12-1-219-0
First Montgomery
PNB
154-3648
Petitioner also controlled another checking account at Cheltenham (No. 05-04-602), and one at *186 PNB (No. 101-3647), both apparently other business accounts, but the record does not indicate in whose names these accounts were maintained. Reuben Suny (Suny) was a business acquaintance and insurance client of petitioner's. Petitioner had known him since before 1950, and Suny had directed many potential insurance clients to petitioner over the years. Suny is now deceased. During the fall of 1969, between late September and early December, Suny gave petitioner various bearer bonds, asking petitioner to sell the securities. In 17 separate transactions, petitioner sold the bearer bonds given to him by Suny through his banks (PNB, Girard, Continental, and Cheltenham), as well as through various brokerage houses. In some instances, petitioner indicated on various bank or brokerage forms that he or one of his businesses was the owner of the bearer bonds, rather than identifying Suny as his principal. The total net proceeds from these sales of $300,376.65 were deposited into various of petitioner's individual and business accounts as follows: Bank
Account Name
Acct. No.
Amount
PNB
Petitioner and Leah Apothaker
238-4351  $103,961.11
PNB
First Montgomery
154-3648  104,892.89
Continental
Partnership
12-1-219-0
53,183.04
Continental
Insurance Corporation
12-1-357-8
19,428.87
Cheltenham
Petitioner or Leah Apothaker
15-02-719 9,696.31
Girard
Petitioner and Leah Apothaker
3-974-508 9,214.43
Total
$300,376.65
*187 Petitioner paid Suny some of the proceeds of the bond sales by checks drawn on various of his accounts, as follows: Bank
Account Name
Acct. No.
Amount
PNB
Petitioner and Leah Apothaker
238-4351  $ 29,626.80
PNB
101-3647  5,000.00
Girard
Petitioner and Leah Apothaker
3-974-508 11,600.00
Cheltenham
Petitioner or Leah Apothaker
15-02-719 5,000.00
Cheltenham
05-04-602 27,500.00
Continental
Partnership
12-1-219-0
23,000.00
Continental
Insurance Corporation
12-1-357-8
2,400.00
Total
$104,126.80
After the proceeds of the various bond sales were deposited into petitioner's various bank accounts, other checks were drawn on these accounts within a few days of the deposits, checks that, when taken together with the identified checks to Suny, approximately equal or exceed the proceeds of each of the sales. Some of these checks can be traced by contemporaneous deposits of equal amounts into other of petitioner's accounts, but most of these checks cannot be so traced. Even with respect to these deposits in other accounts traceable to checks drawn on the deposits representing the proceeds of bond sales, there were other *188 checks drawn on these other accounts approximately equalling or exceeding the traceable deposits. The record does not indicate the payees of these various checks drawn against the proceeds of the bond sales. Petitioner completed the last of these bearer bond sales through the brokerage firm of Francis I. DuPont Co. (DuPont Co.), using an account newly opened in the name of First Montgomery. The proceeds of this sale, $94,920.64, were deposited into First Montgomery's account at PNB (No. 154-3648). Petitioner then drew checks totalling $46,965.69 on this account, of which $41,444.44 was deposited into other of petitioner's accounts, including $13,096.93 into his individual account at PNB (No. 238-4351). On December 15, 1969, the balances in petitioner's individual account at PNB and First Montgomery's PNB account were debited in the respective amounts of $13,807.06 and $54,140.31, pursuant to an attachment obtained by DuPont Co. About that time, the banks and brokerage firms had discovered that the bearer bonds petitioner had sold through them (which petitioner had obtained from Suny) had been stolen. The record does not establish that petitioner knew at the time of the sales *189 that the bearer bonds were stolen. The record does not establish that petitioner retained any of the proceeds of the bond sales for his own use or benefit, except possibly one commission of $500. Petitioner admits that he received a $500 commission from Suny from the proceeds of one of the early sales, and that he did not report the $500 on his individual return for 1969. First Montgomery's corporate tax return for its fiscal year September 1, 1969 through August 31, 1970, reports gross commission income of $1,864. The corporate return for H. Apothaker's Son, Inc., for its fiscal year ending August 31, 1969 (before the sales in question) is in evidence, but the return for its fiscal year ending August 31, 1970 was not submitted into evidence. In his statutory notice, respondent determined that petitioner had received and failed to report taxable income of $128,302.48 from the sale of securities. Respondent calculated this amount by reducing the $300,376.65 of total bond sales proceeds by the $104,126.80 petitioner paid Suny by check and by the $67,947.37 attached by DuPont Co. Respondent also determined that petitioner received from Suny four checks totalling $23,600 representing *190 taxable income he failed to report. There is no evidence in the record in regard to this $23,600. ULTIMATE FINDING OF FACT Respondent has failed to prove that petitioner underpaid his 1969 Federal income tax. OPINION Respondent contends that petitioner fraudulently omitted income he received from the sale of stolen securities. Petitioner claims that when he sold the bearer bonds for Reuben Suny, he did not know they were stolen and that he paid over all of the proceeds of those sales, except for a $500 commission, to Reuben Suny. Petitioner has the burden of proving by a preponderance of the evidence that respondent's deficiency determination is erroneous. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Respondent, however, must prove fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Stone v. Commissioner,56 T.C. 213, 220 (1971). Here, unless respondent proves petitioner's fraud, the statute of limitations precludes his assessment and collection of any deficiency. Secs. 6501(a), 6501(c)(1); Estate of Temple v. Commissioner,67 T.C. 143, 159-160 (1976). *191 Where, as here, respondent's fraud allegation is inextricably intertwined with his determination of unreported income, we must be extremely careful to avoid bootstrapping a finding of fraud upon a taxpayer's failure of proof regarding the underlying deficiency determination. Drieborg v. Commissioner,225 F. 2d 216, 218 (6th Cir. 1955), affg. in part a Memorandum Opinion of this Court; Estate of Beck v. Commissioner,56 T.C. 297, 363 (1971); Otsuki v. Commissioner,53 T.C. 96, 106 (1969). [3] In other words, respondent must first prove an underpayment of some amount of tax and that some part of such underpayment was due to fraud. If respondent fails to prove those two elements of fraud, that ends the case, and we need not address the correctness of the underlying deficiency. Since we hold that respondent has failed to prove fraud, we do not reach the issue of the correctness of the underlying deficiency in this case. *192 As part of his burden in a fraud case, respondent must first prove that petitioner has to some extent underpaid his taxes. Absent an underpayment, there is nothing to which the fraud addition may attach. Sec. 6653(b). See Jenkins v. United States,313 F. 2d 624, 627 (5th Cir. 1963). Consequently, the existence of an underpayment is an element of the fraud that respondent must establish. Hebrank v. Commissioner,81 T.C. 640, 642 (1983); Stone v. Commissioner,supra,56 T.C. at 220. [4] Respondent need not prove the precise amount of the underpayment, but he must prove that petitioner has underpaid his tax to some extent, Otsuki v. Commissioner,supra,53 T.C. at 105. As with the remainder of his burden, respondent must establish this element by clear and convincing evidence. Sec. 7454(a); Rule 142(b). He has not done so here. *193 Respondent contends that he has satisfied his burden of proving an underpayment by tracing the bond sales proceeds into petitioner's various bank accounts, and that petitioner must prove that he turned over all of the proceeds to Suny. In some circumstances, proof of receipt of funds alone may be sufficient to establish an underpayment where the source is clearly taxable or at least will support a strong inference of taxability. See Goe v. Commissioner,198 F. 2d 851, 852-853 (3d Cir. 1952), affg. a Memorandum Opinion of this Court, cert. denied 344 U.S. 897 (1952); Brooks v. Commissioner,82 T.C. 413, 431-433 (1984). However, the mere fact that funds are deposited in a bank account does not establish that the deposits are taxable income. C.B.C. Super Markets, Inc. v. Commissioner,54 T.C. 882, 897 (1970); Jones v. Commissioner,29 T.C. 601, 619 (1957); York v. Commissioner,24 T.C. 742, 743-744 (1955). Here, neither the source of the deposits nor petitioner's receipt of the proceeds *194 is at issue; rather, the question is the consequence to petitioner of his receipt, which turns largely upon his disposition of the proceeds. Amounts a taxpayer receives under a claim of right or without restriction upon disposition are taxable income to him. North American Oil v. Burnet,286 U.S. 417 (1932). Conversely, amounts a taxpayer receives as a mere conduit or agent for transmittal to another are not taxable to him. Lashells' Estate v. Commissioner,208 F. 2d 430 (6th Cir. 1953), revg. in part and affg. in part a Memorandum Opinion of this Court; Diamond v. Commissioner,56 T.C. 530, 541 (1971), affd. 492 F. 2d 286, 291-292 (7th Cir. 1974). Respondent clearly recognizes that petitioner was never the owner of the securities he sold and concedes that he forwarded a substantial portion of the proceeds to Suny, his purported principal. Respondent cannot satisfy his burden of proof merely by tracing the bond sales proceeds to petitioner's bank accounts and then assuming that petitioner was not acting as Suny's agent or that if he was acting as Suny's agent, that he nonetheless retained part of the proceeds. *195 Of course, as with other elements in a fraud case, respondent may prove an underpayment through circumstantial evidence. Cf. Spies v. United States,317 U.S. 492 (1943); Otsuki v. Commissioner,supra,53 T.C. at 105-106. Nonetheless, we find that respondent has failed to prove by the requisite clear and convincing evidence that petitioner kept any portion of the proceeds for his own use or benefit. Petitioner paid a portion of the sales proceeds ($104,126.80) to Suny by checks drawn on various of his personal and business accounts.These checks were made out to Reuben Suny or endorsed by him. Petitioner also shuffled some of the sales proceeds among his various accounts. Nonetheless, even after considering these interaccount transfers, there were checks drawn on these accounts in amounts that appear equal to or in excess of the balance of the proceeds that respondent determined were taxable to petitioner. Despite the fact that most of petitioner's banking records were or at one time had been in the Government's possession, respondent did not offer *196 into evidence, nor explain his failure to do so, any of the checks drawn on these accounts that would trace petitioner's disposition of the balance of the proceeds. [5] Since respondent has the burden of proof, we may fairly infer that these bank records would not support his determination. Cf. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158 (1946), affd. 162 F. 2d 513 (10th Cir. 1947). Respondent argues that petitioner knew the bonds were stolen when he sold them, and from this concludes petitioner kept a portion of the proceeds for himself. There is no evidence in the record to establish that petitioner at the time he sold the bearer bonds knew they *197 were stolen. Other than attacking petitioner's credibility, respondent's main basis for inferring that petitioner knew the securities were stolen seems to be his conclusion that petitioner kept some of the proceeds for his own benefit. Neither the attack on credibility nor respondent's patently circular argument suffice as evidence, let alone clear and convincing evidence, that petitioner knew the bonds were stolen or that petitioner retained any portion of the proceeds from the sales of the stolen bonds. Respondent also sought to trace these bond sales proceeds to petitioner's investment partnership with his wife, Leah. The partnership returns for its fiscal years overlapping and following petitioner's taxable year 1969 do indicate a substantial increase in the respective capital accounts of petitioner and his wife. Respondent presented as an "expert witness" a revenue agent who attempted to show by a source and application of funds method that these increases were attributable to the proceeds of the various securities sales. There is simply no factual predicate for the revenue agent's conclusion. He did not purport to trace any portion of the bond sales proceeds in the bank *198 accounts to the partnership capital accounts. By his own admission, the revenue agent used only petitioner's reported taxable income as a source. The revenue agent did not attempt in any way to negate nontaxable items (current assets and nontaxable proceeds such as cash on hand from prior years, gifts, legacies, and loans) as possible sources of these increases in partnership capital accounts. His failure to do so renders his "tracing" completely meaningless. Respondent's only explanation for this failure is his erroneous assertion that it was petitioner's burden to prove sources other than his reported taxable income. Cf. United States v. Massei,355 U.S. 595 (1958). Without any direct tracing of some part of the bond sales proceeds from the bank accounts to the partnership capital account and without negating possible nontaxable sources for the increases in partnership capital accounts, respondent is merely piling inference on top of inference, suspicion on top of suspicion, without any evidence to support it. Petitioner does not have any burden to knock down that house of cards. [6]
*199 Petitioner testified that he turned over all of the proceeds to Suny, except for $500. He also testified that the bulk of these disputed proceeds were in cash rather than by check because that was the way Suny wanted it done. Petitioner described Suny as a domineering man who sat at his desk ordering people around, a man who "wanted to have things done for him." Given the fact that Suny was a long-time insurance client and had referred many potential insurance clients to petitioner over a long span of years, petitioner's explanation of the transaction is not facially unreasonable. A substantial portion of respondent's case related to events transpiring long after the year before the Court, some relating to settlement efforts in this Tax Court case, and all part of respondent's effort to discredit petitioner as a witness. Respondent's attempt to impeach petitioner's testimony by his subsequent testimony in a deposition and at another trial was unpersuasive. Whatever minor inconsistencies there were, if indeed any, were adequately explained by petitioner. [7] Respondent also tried to impeach petitioner by the apparent misstatements in petitioner's 1977 bankruptcy petition and *200 in his financial statement (Form 433) submitted to respondent in 1978 in connection with his offer to settle this case, both made under penalty of perjury. [8] However, even if we found petitioner's testimony to be completely uncredible and unworthy of belief, this would not satisfy respondent's burden of proof. *201 Mere suspicion does not prove fraud, and the fact that we may not find a taxpayer's testimony wholly credible is not sufficient to establish fraud. See Cirillo v. Commissioner,314 F. 2d 478, 482 (3d Cir. 1963), affg. in part and revg. in part a Memorandum Opinion of this Court; Green v. Commissioner,66 T.C. 538, 550 (1976); Shaw v. Commissioner,27 T.C. 561, 569-570 (1956), affd. 252 F. 2d 681 (6th Cir. 1958). [9] Certainly mere suspicion does not prove, by clear and convincing evidence, that petitioner underpaid his 1969 taxes. In reaching our conclusion that respondent has not proved an underpayment of tax, we do not rely upon petitioner's testimony but upon respondent's failure to present any persuasive evidence, let alone clear and convincing evidence, that petitioner kept any portion of the bond sales proceeds for his own use or benefit.
*202 In his statutory notice, respondent also determined that petitioner received an additional $23,600 of unreported income in the form of four checks from Suny. Respondent offered no evidence on these items at trial; consequently, they provide no basis for finding that respondent has proved an underpayment. Likewise, we do not think that an underpayment is established by petitioner's admitted failure to report on his individual return the $500 commission from Suny. Petitioner claims he reported this amount on a corporate return, and First Montgomery's return for its fiscal year covering the period in question reports commission income of $1,864. Petitioner believed the commission was reported on the return of his insurance corporation (H. Apothaker's Son, Inc.) for the period in question (not First Montgomery's), but that return was not offered in evidence. In other words, respondent has not established that petitioner did not report this $500 on one of the corporate returns. Petitioner conducted many of his business activities through his corporations, and respondent has not shown that the $500 commission was properly taxable to petitioner individually rather than to one of *203 his corporations. Indeed, given the importance of Suny to petitioner's insurance business, it may well be that such commission was properly taxable to petitioner's insurance corporation, as petitioner claims to have reported it. Finally, even if we found that this $500 commission resulted in an underpayment, we would not conclude that respondent had proven such underpayment was attributable to petitioner's fraudulent intent to evade tax, since it appears the commission was reported and there appears to be a reasonable question as to whether petitioner individually or one of his corporations was properly taxable on this sum. Because of respondent's failure of proof, the statute of limitations bars assessment of any deficiency in petitioner's 1969 tax liability. Secs. 6501(a), 6501(c)(1). Accordingly, Decision will be entered for the petitioner.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in question, and any reference to "rules" is to the Tax Court Rules of Practice and Procedure.↩
2. Although Leah did not sign this purported joint return, the return included her W-2 wages. Leah was not included in respondent's statutory notice to petitioner and is not a party to this case.↩
3. See also Meredith v. Commissioner,T.C. Memo. 1985-170; Phillips v. Commissioner,T.C. Memo. 1984-133; Compton v. Commissioner,T.C. Memo. 1983-642; Zack v. Commissioner,T.C. Memo. 1981-700, affd. 692 F. 2d 28 (6th Cir. 1982), cert. denied 460 U.S. 1084 (1983); Ginsburg v. Commissioner,T.C. Memo. 1976-199; Mazzoni v. Commissioner,T.C. Memo. 1970-37, affd. sub nom. Estate of Mazzoni v. Commissioner,451 F. 2d 197↩ (3d Cir. 1971).
4. See also Meredith v. Commissioner,supra;Patton v. Commissioner,T.C. Memo. 1985-148; Phillips v. Commissioner,supra;Compton v. Commissioner,supra.↩
5. Respondent submitted into evidence bank statements from most of petitioner's business and personal accounts and cancelled checks drawn on First Montgomery's account at PNB. The schedule of checks petitioner paid to Suny, submitted as a joint exhibit, identifies specific checks drawn on specific accounts, payable to Reuben Suny or payable to cash and endorsed by Reuben Suny. However, that stipulation does not say that these are the only checks of that type drawn on these accounts.↩
6. At trial, we excluded from evidence as irrelevant various of petitioner's individual returns for years after 1971. These returns remained with the record as respondent's offer of proof. We have carefully re-examined these materials and we adhere to our ruling at trial. Respondent's purpose in offering these materials was to show petitioner's disposition of various securities acquired during the period in question and shortly thereafter. As with respondent's flawed source and application analysis, there is nothing in these returns that would trace petitioner's acquisitions to the bond sales proceeds rather than to other sources. Even considering these materials as evidence, our conclusion herein would be the same.↩
7. We likewise adhere to our exclusion at trial of petitioner's responses to various of respondent's interrogatories, offered by respondent for impeachment. Petitioner's answers do not suggest any meaningful inconsistency with his testimony at trial, and we disagree with respondent's assertion on brief that petitioner's answers were "deliberately evasive, vague, and incomplete." If respondent was dissatisfied with petitioner's responses, he should have sought an adequate response pursuant to our rules. See Rules 71(c), 104(d). ↩
8. We find petitioner's seemingly inconsistent statements in 1977 and 1978 rather troubling. However, we are more troubled by the paucity of evidence presented by respondent as to 1969, the year involved in this case. We are particularly concerned about respondent initiating a criminal investigation in regard to the Form 433 submitted in 1978 in connection with efforts to settle this case. That action could well have been viewed by petitioner as a personal vendetta against him and no doubt explains petitioner's decision to put on no evidence and to put respondent to his proof, as he was entitled to do. More importantly, respondent's 1978 foray into criminal investigation was unrelated to the issue in the case, no doubt impeded much needed discovery in this case, and is hardly a substitute for evidence as to the events in 1969, the only year before this Court.↩
9. See also Meredith v. Commissioner,supra;Rinehart v. Commissioner,T.C. Memo. 1983-184; and DeClercq v. Commissioner,T.C. Memo. 1982-386↩.